**INTERNATIONAL CHAMBER OF COMMERCE
INTERNATIONAL COURT OF ARBITRATION**

**ICC CASE NO 23856/MK**

**CONSTELLATION OVERSEAS LTD (British Virgin Islands)**

**Claimant**

**vs**

1. **ALPERTON CAPITAL LTD (British Virgin Islands)**
2. **CAPINVEST FUND LTD (Bahamas)**
3. **UNIVERSAL INVESTMENT FUND LTD (Bahamas)**
4. **COMERCIAL PERFURADORA DELBA BAIANA LTDA (Brazil)**
5. **INTEROIL REPRESENTAÇÃO LTDA (Brazil)**

**Respondents**

---

**INTERIM AWARD**

**26 April 2019**

---

**ARBITRAL TRIBUNAL**

**Professor Lucy Reed, President
Mr Mark Kantor
Mr Daniel L Jackson**

Contents

I.     INTRODUCTION .................................................................................................3
II.    BACKGROUND TO THE DISPUTE.................................................................3
    A.   The Parties ....................................................................................................3
    B.   The Tribunal .................................................................................................6
    C.   The Administrative Secretary ....................................................................6
    D.   The Arbitration Agreement ........................................................................6
    E.   Applicable Law .............................................................................................7
    F.   Factual Background ......................................................................................8
III.   PROCEDURAL HISTORY ..............................................................................16
    A.   Procedural History Through the Interim Order of 8 April 2019 .........16
    B.   The Interim Order of 8 April 2019 and Subsequent Procedural History ..........22
IV.    THE PARTIES' POSITIONS ...........................................................................25
    A.   The Respondents' Case .............................................................................25
    B.   The Claimant's Case ..................................................................................33
V.     ANALYSIS AND CONCLUSIONS OF THE TRIBUNAL ...........................41
    A.   Applicable Standard for Interim Measures .............................................41
    B.   *Prima Facie* Claim and Case on the Merits ............................................42
    C.   Imminent and Irreparable or Substantial Harm....................................44
    D.   Balance of Harm Between the Parties .....................................................45
    E.   Security for Costs and Damages ...............................................................47
VI.    DISPOSITION ...................................................................................................49

## I. INTRODUCTION

1.  This Interim Award is made in respect of the Respondents' Application of 11 February 2019 for interim relief enjoining the Claimant from taking certain actions in voluntary judicial restructuring proceedings in Brazil that allegedly would irreversibly deprive the Respondents of the value of certain shares allegedly wrongfully transferred from them, pending a final Award in this arbitration (the "**Application for Interim Measures**"). This Interim Award follows the Tribunal's Interim Order of 8 April 2019.

2.  As set out below, the Tribunal has determined to grant the Application for Interim Measures in substantial part. The Tribunal finds it necessary to order interim measures to preserve its ability to render an effective final Award on, among other claims and counterclaims, whether the Claimant or the Respondent Alperton owns the Disputed Shares. The restructuring as planned is simply irreconcilable with a possible final Award in the Respondents' favor.

3.  Recognizing the import of this Interim Award for the restructuring proceedings, the Tribunal also grants the Claimant's request for security for damages, in specific by ordering the Respondents to post security in the amount of US$ 10,000,000 in the form of a bond to be negotiated by the Parties, subject to Tribunal approval, and an unsecured undertaking to be responsible for any costs and damages in excess of this bond to the extent and in the amounts proven to the Tribunal.

## II. BACKGROUND TO THE DISPUTE

4.  The details concerning the Parties and their representatives, the Tribunal, the arbitration agreement, and the procedural history to date, including the hearing on the Application for Interim Measures on 22 March 2019 (the "**Hearing**"), are found below. A summary of the factual background, as necessary for purposes of this Interim Award, is also set out.

### A. The Parties

5.  The Claimant is CONSTELLATION OVERSEAS LTD, a company organized under the laws of the British Virgin Islands, with its principal office at:

    Vanterpool Plaza, 2nd Floor
    Wickhams Cay 1
    Road Town
    Tortola
    British Virgin Islands

6.  The Claimant's legal representatives are:

    Mr Flavio Galdino
    Ms Isabel Picot
    GALDINO, COELHO, MENDES ADVOGADOS
    Av. Rio Branco 138, 11 Andar
    Centro, Rio de Janeiro – RJ

20040-002  Brazil

Tel: +55 21 3195 0240
Email: galdino@gcm.adv.br
       ipicot@gcm.adv.br

and

Mr Paul Friedland
Mr Damien Nyer
Ms Jennifer Glasser
Mr Justin Lee
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
USA

Tel: +1 212 819 8200
Email: pfriedland@whitecase.com
       dnyer@whitecase.com
       jglasser@whitecase.com
       justin.lee@whitecase.com

7.    The Respondents are:

<u>Respondent 1</u> is ALPERTON CAPITAL LTD, a corporation organized under the laws of the British Virgin Islands, with its principal office at:

Vanterpool Plaza
Wickhams Cay 1
PO Box 873
Tortola
British Virgin Islands

<u>Respondent 2</u> is CAPINVEST FUND LTD, a corporation organized under the laws of the Commonwealth of the Bahamas, with its principal office at:

3 Bayside Executive Park
West Bay Street
PO Box N 4875
Nassau
Commonwealth of the Bahamas

<u>Respondent 3</u> is UNIVERSAL INVESTMENT FUND LTD, a corporation organized under the laws of the Commonwealth of the Bahamas, with its principal office at:

3 Bayside Executive Park
West Bay Street
PO Box N 4875
Nassau

Commonwealth of the Bahamas

Respondent 4 is COMERCIAL PERFURADORA DELBA BAIANA LTDA, a corporation organized under the laws of the Federative Republic of Brazil, with its principal office at:

Rua Visconde de Piraja no. 608 sala 205
Ipanema, Rio de Janeiro, RJ
Brazil

Respondent 5 is INTEROIL REPRESENTAÇÃO LTDA, a corporation organized under the laws of the Federative Republic of Brazil, with its principal office at:

Avenida Marechal Floriano
N 19 sala 2201
Rio de Janeiro, RJ
Brazil

8.     The Respondents' legal representatives are:

Mr Joseph E. Neuhaus
Mr Andrew G. Dietderich
Mr Andrew J. Finn
Ms Inbar R. Gal
Ms Maria Slobodchikova
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
USA

Tel: +1 (212) 558-4000
Email: neuhausj@sullcrom.com
       dietdericha@sullcrom.com
       finna@sullcrom.com
       gali@sullcrom.com
       slobodchikom@sullcrom.com

and

Dr Matthias M. Pitkowitz
379 West Broadway
New York, NY 10012
USA

Tel: +1 (646) 902-6993
Email: pitkowitz@gmail.com

### B.    The Tribunal

9.    The co-arbitrator confirmed upon nomination of the Claimant is:

Mr Mark Kantor
709A 8th Street, S.E., Third Floor
Washington, DC 20003
USA

Email:  mkantor@mark-kantor.com

10.    The co-arbitrator confirmed upon nomination of the Respondents is:

Mr Daniel L Jackson
ALIXPARTNERS LLP
2101 Cedar Springs Road, suite 1100
Dallas, TX 75201
USA

Email:  djackson@alixpartners.com

11.    The third arbitrator and President of the Tribunal, appointed by the ICC Court on proposal from the US National Committee, is:

Professor Lucy F Reed
CENTRE FOR INTERNATIONAL LAW
469A Bukit Timah Road
Tower Block #09-01
Singapore 259770

Email:  lreed252@gmail.com

### C.    The Administrative Secretary

12.    On 11 March 2019, with the Parties' consent, the Tribunal appointed Ms Rachel Tan Xi'en as Administrative Secretary.  Ms Tan's contact details are as follows:

Rachel Tan Xi'en
NUS Centre for International Law
469A Bukit Timah Road, Tower Block #09-01
Singapore 259770
Email: ciltanx@nus.edu.sg

### D.    The Arbitration Agreement

13.    The disputes arise under two Shareholders Agreements (the "**SHAs**"): (1) the Shareholders' Agreement relating to the Star Unit I Drilling Vessel dated 24 June 2010, between the Claimant and Respondents 1, 4 and 5, and Bulzow Capital Inc; and (2) the Shareholders' Agreement relating to the Star Unit II Drilling Vessel, dated 24

June 2010, between the Claimant and Respondents 1, 4 and 5, and Guildford Projects Corp.

14. The dispute resolution provisions are contained in Article 18 of the SHAs, with Article 18.3 containing the ICC arbitration agreement:

*18.1 This Agreement is governed by and shall be construed in accordance with the laws of the State of New York, USA.*

*18.2 The Parties shall in good faith use their best efforts and endeavors to settle any dispute amicably through negotiations and other constructive solutions. Notwithstanding, if any Party considers that a dispute exists which has not been settled amicably within thirty (30) days, any such Party may give notice in writing to the other Party to settle the dispute by arbitration, in which case the provisions below shall apply.*

*18.3  All disputes, controversies or differences arising out of or in connection with this Agreement or any breach thereof, including any question regarding its existence, validity or termination and the validity or otherwise of this arbitration clause and the jurisdiction of any arbitrators appointed pursuant hereto, shall be referred to and finally resolved by arbitration under the rules of the International Chamber of Commerce ("ICC") as in force from time to time, which rules are deemed to be incorporated by reference into this Clause.*

*18.4 The number of arbitrators shall be three.*

*18.5 The seat, or legal place, of arbitration shall be New York, NY, USA.*

*18.6 The language to be used in the arbitration proceedings shall be English.*

*18.7 The governing law of the arbitration agreement shall be the laws of the State of New York.*

*18.8 Any award, order, decision or any other judgment arising from the arbitration proceedings shall be made in New York, NY, USA.*

*18.9 If any provision of this Agreement is found by an arbitrator or other competent authority to be invalid, illegal or unenforceable, the provision shall be deemed to be deleted from this Agreement and the remaining provisions shall continue in full force and effect and shall not in any way be affected or impaired thereby.  Constellation and Delba shall nevertheless negotiate in good faith in order to agree to the terms of a mutually satisfactory provision to be substituted for the provision which is invalid, illegal or unenforceable.*

### E.    Applicable Law

15. The applicable law is the laws of the State of New York, USA, in accordance with Article 18.1 of the SHAs.

16.   The governing law of the arbitration agreement is the laws of the State of New York, USA, in accordance with Article 18.7 of the SHAs.

### F.   Factual Background

17.   The factual background below comes from the Parties' submissions to date.   Facts known to be disputed are indicated as such.

#### 1)   The Parties' Venture

18.   According to the Respondents, Alperton and its affiliates have been industry leaders in drilling and oilfield services in Brazil for nearly 60 years and have collaborated with Petroleo Brasileiro S.A ("**Petrobras**") on numerous projects, including the charter, service and/or construction of over a dozen drillships, offshore drilling rigs and other vessels.

19.   According to the Claimant, Constellation is part of the Constellation Group, one of the world's leading offshore drilling companies for the oil and gas industry, with over US$ 945 million in net operating revenues in 2017.   The Constellation Group currently operates 17 onshore and offshore drilling rigs, including three ultra-deepwater drillships (the *Amaralina Star*, *Laguna Star*, and *Brava Star*), and holds ownership interests in five floating production storage and offloading units.

20.   In 2008, Alperton, through its affiliate Delba Drilling BV, entered into agreements with Petrobras for the construction, charter and operation of two ultra-deepwater offshore drillships (ultimately the *Amaralina Star* and *Laguna Star*, the "**Projects**"), for which Petrobras would pay approximately US$ 1.7 billion over six years (the "**Petrobras Agreements**").   Alperton, again via Delba Drilling BV, then entered into agreements to design, build, equip, launch and deliver the two drillships with Samsung Heavy Industries (the "**Samsung Agreements**").

21.   Alperton partnered with Constellation to execute the Projects through two joint ventures.   To this end, the Parties incorporated two drillship companies, Amaralina Star Ltd and Laguna Star Ltd (the "**Drillship Companies**"), each of which had 1000 shares.   Constellation took a 55% stake and Alperton a 45% stake.   Each Company was to be managed by a Board of Directors consisting of five directors appointed by Constellation and four appointed by Alperton.

22.   Alperton contributed the Petrobras and Samsung Agreements, and agreed to be responsible for an initial capital contribution of approximately US$ 48 million for each of the Drillship Companies.   Constellation, as the majority partner, had sole responsibility for managing and operating the Projects, and agreed to fund Alperton's capital contributions – in the form of Cash Calls – if the Drillship Companies' revenue proved insufficient after the initial funding.   Constellation received a percentage of the total capital expenditures as compensation for its supervision services relating to constructing the Drillships.   Its affiliate Constellation Services Ltd provided management services in return for a percentage of the monthly gross revenues, plus additional expenses for the use of its marine bases.

#### 2)   The Shareholders' Agreements

23.  The Parties entered into two substantially similar Shareholders' Agreements dated 24 June 2010 to organize and govern the Drillship Companies:  (*i*) the Shareholders' Agreement relating to the Star Unit I Drilling Vessel, between the Claimant and Respondents 1, 4 and 5, and Bulzow Capital Inc; and (*ii*) the Shareholders' Agreement relating to the Star Unit II Drilling Vessel, between the Claimant and Respondents 1, 4 and 5, and Guildford Projects Corp (the "**SHAs**").

24.  The relevant clauses of the SHAs (in which Delba should be replaced by Alperton), for purposes of this arbitration, include:

a.  Clause 3.2:

(a)  *Subject to the terms of clause 3.2(b) below, to the extent not financed by the Project Loan, all expenditure requirements of the Company which cannot be met out of monies received from the Charterer will be met by the injection of cash (in the form of equity or advance of long term Loans) by the Shareholders.  Each cash call shall, except in cases of urgency, be preceded by thirty (30) days prior written notice from the Company to the Shareholders ("the Cash Call Notice"). ...*

(b)  *Delba may fund its obligations under this Agreement to provide equity and/or Loans to the Company by means of, in its sole discretion, (x) cash (through paid-in capital or Shareholder Funding Loans), (y) loans from third-party lenders directly to Delba and not to the Company or (z) Delba Carried Loans* [defined in Clause 1.1 as amounts advanced by Constellation at Delba's request to the Company]*.  In the event that Delba chooses to fund its equity and/or Loans by means of Delba Carried Loans ..., Constellation shall be required to loan an amount to Delba (or an affiliate) equal to the percentage of the cash call allocated to the Delba Shares. ...*

(ii)  *All amounts outstanding under the Delba Carried Loans shall earn interest at the rate of twelve percent (12%) per annum compounded annually.  Notwithstanding, all Delba Carried Loans covering amounts which exceed the Budgeted Capex shall earn interest at the rate of thirteen percent (13%) per annum compounded annually.  ...*

b.  Clause 4.5:

A meeting of the Board of Directors "*may be requested at any time by any Manager or Director of the Company and called by the Chairman who shall give seven (7) days' written notice thereof .... specifying the date, time and place of the meeting and the nature of the business to be transacted....*"

c.  Clause 4.8:

*Constellation and Delba undertake to procure that the Directors appointed by it will at all times act in good faith and in the best interests of the Company in exercising their votes.*

d.  Clause 4.9:

(a)  *The unanimous consent of the Directors present at a meeting of the Board of Directors shall be required for the following decisions (each, a "**Fundamental Business Decision**"): ....*

-  *requesting cash calls which are not provided for in the Budget (except for cash calls which in the reasonable and documented opinion of Constellation are designed to address a safety and/or operational issue of the Unit or to ensure that each of the Company and the Charterer and the Operator complies with its obligations under the Unit Contracts and the Project Loan Documents); ....*

(b)  *The unanimous consent of the Shareholders present at a general meeting shall be required for the following decisions (each, also, a "**Fundamental Business Decision**"): ...*

-  *approval of the annual budgets; ...*

-  *any corporate reorganization, liquidation or dissolution of the Company.*

*If the Directors or, as the case may be, the Shareholders, fail to reach a unanimous decision on any of the **Fundamental Business Decisions**, Clause 8 (Deadlock) shall apply. ....*

e.  Clause 8:

8.1  *If the circumstances described in Clause 4.9 arise then this state of affairs shall constitute a deadlock (a "**Deadlock**");*

8.2  *If a Deadlock occurs and the Shareholders have failed to meet or find a solution to the Deadlock within fifteen (15) days from the date of referral, then:*

(a)  *Constellation shall be obliged to purchase (and Delba shall be obliged to sell) the Delba Shares and the Loans of Delba in the Company (except the Delba Carried Loans) for a price (the "**Deadlock Sale Price**") equal to the aggregate of (a) Delba's proportionate share of the the [sic] market value of the Unit as determined by the Appraiser, calculated as at the date on which the Deadlock occurred (the "**Asset Value**") less (b) Delba's proportionate share of any amounts outstanding under the Project Loan and any debt outstanding owed by the Company to a third party less (c) the outstanding amounts of the Delba Carried Loans as at the Sale Date (as defined below); ...*

8.3   *Any sale and transfer of Shares and Loans required to be effected pursuant to Clause 8.2(b) above shall, unless the Shareholders agree to any earlier date, be completed on the later of (a) the day falling thirty (30) days after the expiry of the fifteen (15)-day period referred to in Clause 8.2 above, and (b) five (5) Business Days after the date on which any necessary consent of the Sub-Charterer and the Project Lenders is obtained for the sale (the "**Sale Date**"), ...*

8.4   *If either Shareholder (or its Lending Subsidiary), after having become bound to transfer its Shares and Loans in accordance with any provision of this Agreement, defaults in so doing, the Company may (if permitted by applicable law) receive the purchase price and the relevant Directors may appoint some person (who shall be deemed to be the attorney of the seller for the purpose) to do all such things as may be required by applicable law to enable the buyer to be entered in the Register of Shareholders of the Company as the holder of the Shares and shall hold the purchase price in trust for the seller. ... The receipt of the Company therefor shall be a good discharge to the buyer and after its name shall have been entered in the Register of Shareholders of the Company in exercise of the aforesaid power the validity of the transaction shall not be questioned by any person.*

f.   Clause 9.3:

*If one of the Shareholders (for the purpose of this Clause 9.3, the "**Defaulting Shareholder**") fails to meet any cash calls ... or if Delba fails to repay the Delba Carried Loans that are to be paid in accordance with this Agreement, within a period of fifteen (15) days of receipt of a request therefor from the Managers or the Board, then the non-defaulting Shareholder (for the purposes of this Clause 9.3 and Clauses 9.4 to 9.6, the "**Non-Defaulting Shareholder**") shall within a further period of thirty (30) days be entitled:*

(a)   *If the Defaulting Shareholder is Delba:*

(i)   *and only in relation to the repayment of the Delba Carried Loans in accordance with the terms of the Agreement, to purchase all of the Delba Shares and the Loans of Delba (but not the Delba Carried Loans) in the Company (which Delba shall, subject to obtaining all necessary consents (if any) from the Sub-Charterer and the Project Lenders, be obliged to sell and transfer) for a sum equal to the Deadlock Sale Price and (x) reduced by ten percent (10%) as a penalty for the breach of this Agreement or (y) without reduction in the event the Delba Carried Loans become due as a result of the termination of the Sub-Charter prior to its twelfth (12th) anniversary counted from the Date of Acceptance. ...*

## 3)   **The Financing and Cash Calls**

25.  Between April and September 2011, Alperton and Constellation amended Alperton's initial contributions of US$ 48 million to reflect new subordinated loans to the Drillship Companies that were fully financed by Constellation and added to the Delba Carried Loans.  The initial amounts and amendments represented the first four Cash Calls.

26.  Between 20 December 2011 and 1 April 2014, 11 more Cash Calls were made for each of the Drillship Companies.  Constellation financed Alperton's share of those Cash Calls by increasing the Delba Carried Loans, bringing the balance as of June 2014 to US$ 231,164,927.74.[1]  On 21 June 2014, the Alperton Directors signed resolutions to ratify those Cash Calls retroactively (the "**Ratified Cash Calls**").  Alperton alleges that in ratifying those Cash Calls, it relied on Constellation's good faith in having disclosed all pertinent information and representing that the Cash Calls were proper and in the best interests of the Drillship Companies, as required by Clause 4.8 of the SHAs.  The Ratified Cash Calls are not specifically at issue in the Application for Interim Measures, but are raised in the Answer and Counterclaims and are in dispute.

27.  Alperton alleges that, after June 2014, Constellation unilaterally issued quarterly Cash Calls without giving the 30 days' written notice required by Clause 3.2 of the SHAs or obtaining the unanimous approval of the Board of Directors required by Clause 4.9 of the SHAs for "*request*[ed] *cash calls*" as Fundamental Business Decisions (the "**Disputed Cash Calls**").  According to Alperton, Constellation issued the Disputed Cash Calls, paid Alperton's 45% share, and – without allowing Alperton to exercise the discretion granted in Clause 3.2(b) of the SHAs – added those amounts to the Delba Carried Loans, accruing interest at 12-13%.

28.  In July and August 2017, following an overture from Constellation, Alperton began to consider selling its minority stake in the Drillship Companies.  Alperton retained an affiliated financial adviser, Piemonte Holding, to value its shares.  According to the Respondents, Piemonte discovered "*multiple red flags suggesting that the Drillship Companies' expenses had been artificially inflated, resulting in unnecessary cash injections and, due to Constellation's improper handling of the Cash Calls …, resulting* [in] *inflation of the Delba Carried Loans.*"[2]

29.  In October 2017, Alperton and its Directors began requesting information and documents related to these alleged red flags, including possible improper transactions between Constellation and its affiliates.  The Parties dispute whether Constellation provided sufficient information and documents in response to these requests.

30.  In any event, the Alperton Directors sent formal letters requesting Board meetings to discuss the red flag issues.  The Respondents allege that the Constellation Directors largely ignored these requests, changed Board meeting agendas to exclude discussion of related-party transactions, and demanded that the Alperton Directors sign unnecessary non-disclosure agreements.[3]  On 30 July 2018, the Alperton Directors filed a books and records action in the BVI.

---

[1] Respondents' Answer to Request for Arbitration and Counterclaims ("**Answer and Counterclaims**"), para 52.
[2] Respondents' Application for an Award of Interim Measures ("**Application**"), para 14.
[3] Application, para 17.

### 4) The 7 August 2018 Deadlock and the Disputed Shares

31.     A key event occurred on 7 August 2018 with a meeting of the Drillship Companies' Boards of Directors.  The agenda included, as one of four items:  *"(d) An update as to pending, unresolved matters discussed in the last Board of Directors meeting of the Company (including cash calls and anticipations)."*[4]  The Constellation Directors – according to Alperton, without the proper advance notice – called for a vote to ratify all of the quarterly Disputed Cash Calls made since 2014, and proceeded to vote to ratify those Cash Calls.  The Alperton Directors protested and then abstained, on grounds that they lacked sufficient information to make informed decisions in the best interests of the Drillship Companies as required by Clause 4.9 of the SHAs.

32.     It is undisputed that the Board vote to ratify the Disputed Cash Calls was not unanimous.  What is disputed is whether the votes involved Fundamental Business Decisions requiring a unanimous vote under Clause 4.9 of the SHAs.  The Claimant's position is that all the Cash Calls were Fundamental Business Decisions, as "*requests for cash calls*" under Clause 4.9.  The Respondents take the opposite view, arguing that ratification of **past** Cash Calls are not Section 4.9 "*requests for cash calls*" constituting Fundamental Business Decisions, because they involve retroactive approval for funds already spent and assessed (in Alperton's case, allegedly without consent) against the shareholders.

33.     Later on the same day as the Board Meeting, 7 August 2018, Constellation issued a Deadlock Notice under Clause 4.9 of the SHAs.  Constellation informed Alperton that its preliminary determination of the Deadlock Sale Price was a **negative** US$ 330,300,000 to US$ 240,300,000 for both Companies, meaning that Constellation had a right to buy out Alperton's shares for nothing and Alperton had to pay Constellation over US$ 240 million.[5]  Even excluding the Disputed Cash Calls, Constellation calculated a **negative** Deadlock Sale Price of US $209,900,00 to US$ 119,900,000.[6] The Deadlock Notice reflects Constellation's determination that the Delba Carried Loans were approximately US$ 403 million, including the Disputed Cash Calls.[7]

34.     Also on the same day as the Board Meetings and the Deadlock Notice, on 7 August 2018, Constellation filed its Request for Arbitration in these proceedings.  The Claimant seeks *inter alia* a determination as to whether it was entitled to buy Alperton's 45% shareholding in the Drillship Companies (the "**Disputed Shares**") after the Deadlock and, if so, at what price and an order that the Respondents pay to Constellation the net outstanding amount owed for the Delba Carried Loans based on the Deadlock Sale Price, in an amount to be determined during the course of the proceeding but preliminarily assessed by Constellation at no less than US$ 330,300,000.

35.     On 7 September 2018, after Constellation refused to agree to refrain from transferring the Disputed Shares to itself pending resolution of the dispute, Alperton filed a request for injunctive relief with the BVI Eastern Caribbean Supreme Court in the High Court of Justice.  Settlement discussions followed, but proved unsuccessful.  For

---

[4] R-23, Notice and Agenda of Board Meetings, 27 July 2018.
[5] Request for Arbitration, paras 43-44; C-7, Deadlock Notice, at 2.
[6] C-7, Deadlock Notice, at 2.
[7] C-7, Deadlock Notice, at 3-4.

reasons that are disputed, Alperton postponed a hearing and did not pursue the injunction action in the BVI.

36.    At a later time, to be effective as of 21 September 2018, Constellation transferred the Disputed Shares to itself and recorded ownership in its name in the BVI Register of Members.[8]  Alperton alleges that it did not learn of this transfer until approximately the time that Constellation filed for reorganization, as described immediately below.

### 5)   Initiation of the Judicial Reorganization Proceedings in Brazil

37.    On 6 December 2018, Constellation and various affiliates filed a joint voluntary judicial reorganization petition (the "**RJ Petition**") in Brazil with the Business Chamber of the Court of the City of Rio de Janeiro ("**RJ Court**" and the "**RJ Proceedings**").  According to Alperton, Constellation is proceeding in the RJ Court "*as if Constellation owned 100% of the Companies' Shares*."[9]  Constellation included the Drillship Companies as debtors in the RJ Petition, without disclosing Alperton's 45% interest – because, says Constellation, it had become the owner of the Disputed Shares – or this   pending arbitration concerning ownership of those Shares.  Constellation petitioned for consolidated treatment and joint administration of all debtor entities, including the Drillship Companies and a separate company that owns the third ultra-deepwater drillship *Brava Star*. Constellation did not obtain the consent of Alperton as required under Section 4.9(b) of the SHAs, again, says Constellation, because Constellation had become the owner of the Disputed Shares.

38.    As part of the RJ Petition, Constellation filed the Plan Support and Lock-Up Agreement (the "**PSA Agreement**" or "**RJ Plan")** that it had reached with certain of its lenders.   As described by the Respondents, the PSA Agreement contains Constellation's valuation of the Drillship Companies showing positive minimum net equity figures between US$ 163 million and US$ 363 million.[10]   Under the proposed plan, lenders under the *Amaralina Star* and *Laguna Star* drillship and the *Brava Star* drillship finance facilities will refinance a combined total of US$ 592.2 million of outstanding debt, and extend US$ 39.1 million in new financing, contingent on the use of the drillship companies as collateral.  The *Brava Star* lenders, who are lending US$ 344.3 million for the *Brava Star* drillship (which is newer than the *Amaralina Star* and *Laguna Star* Drillships), are to receive a lien on the *Amaralina Star* and *Laguna Star* drillships and on 100% of the shares of the Drillship Companies, and the *Amaralina Star* and *Laguna Star* lenders are to receive a lien on the *Brava Star* drillship.[11]   According to the Claimant, the creditors' demand for this cross-collateralization is critical to the restructuring plan.[12]

39.    The PSA Agreement calls for a closing within six months of the bankruptcy filing, or by 6 June 2019.[13]   The first Assembly of Creditors meeting ("**Creditors Meeting**") was originally scheduled for 25 March 2019, but was first postponed to 8 April and

---

[8] R-42, Register of Members of Amaralina Star and Laguna Star, 21 September 2018.
[9] Application, para 22.
[10] Application, para 24; R-19, Plan Support and Lock-Up Agreement ("**PSA**"), Restructuring Term Sheet.
[11] R-19, PSA, Restructuring Term Sheet at 9 and 11.
[12] Opposition to Application for Interim Measures ("**Opposition**"), paras 72-73.
[13] R-19, PSA, § 11.01(p)(vii).

then, on 9 April, again postponed to 30 April 2019 (first meeting) and 9 May 2019 (potential second meeting).

### 6) The New York Chapter 15 Proceedings

40. On the same date Constellation filed its petition to start the RJ Proceedings in Brazil, Constellation also filed a petition for recognition of a foreign proceeding in the US Bankruptcy Court for the Southern District of New York, (the "**NY Chapter 15 Petition**").  In the NY Chapter 15 Petition, Constellation described the Plan Support Agreement to be "*supported by certain lenders holding at least 97.5% of the combined aggregate outstanding principal amount under the Company's project financings* [and] *its unsecured working capital lender....*".[14]  In the NY Chapter 15 Petition, Constellation characterized this arbitration as an unspecified dispute with Alperton regarding the SHAs.

41. Alperton filed an objection to the NY Chapter 15 Petition, and the US Bankruptcy Court has heard arguments on whether the Brazilian court is the appropriate court to take primary jurisdiction over the restructuring of a group of debtors with multiple non-Brazilian companies and management located outside Brazil.  As set out in the Procedural History below, the US Bankruptcy Court has lifted a stay to allow this arbitration to continue.

### 7) The Pending Brazilian Proceedings

42. At the request of the Tribunal at the close of the Hearing on the Application for Interim Measures, the Parties reported on the status and certain implications of the Brazilian RJ Proceedings.  Sullivan & Cromwell submitted letters on behalf of the Respondents on 27 and 31 March.  Galdino & Coelho submitted a letter on 29 March 2019 on behalf of the Claimant, with a Declaration of Justice Francisco Rezek, and an email on 1 April 2019.

43. Counsel for Alperton reported that Alperton made various filings in the RJ Proceedings in the first-instance RJ Court to inform the Court of its 45% shareholder interest in the Drillship Companies and of this pending arbitration, as well as to object to the RJ Proceedings and proposed RJ Plan.  On 28 January 2019, Alperton filed an appeal with the Court of Appeals of the State of Rio de Janeiro against the RJ Court granting Constellation's RJ Petition on grounds, among others, that Constellation improperly held itself out as owner of 100% of the Drillship Companies and lacked the corporate authority to put the Companies into the RJ Proceedings.  In the alternative, Alperton asked the Court of Appeals, among other things, to separate the RJ Proceedings of the Drillship Companies from that of the other Constellation Group entities, order Constellation to refrain from transferring or encumbering the Disputed Shares or the Drillship Companies' assets, and recognize the primacy of this Tribunal to resolve ownership of the Disputed Shares and prevent any restructuring irreconcilable with an award in Alperton's favor.

---

[14] R-18, Petitioner's Declaration and Verified Petition for Recognition of the Brazilian RJ Proceeding and Motion for Order Granting Related Relief Pursuant to 11.U.S.C. §§ 1515, 1517, and 1520, at 9-10.

44.  On 31 January 2019, the RJ Court confirmed its previous ruling permitting the RJ Petition to proceed, stating that the BVI shareholder registry evidence suggested that Constellation owned all shares in the Drillship Companies.  On 25 February 2019, the Court of Appeals denied Alperton's request for interim relief, without addressing the issue of Alperton's ownership of the Disputed Shares.  Alperton's appeal of this decision is pending.

45.  On 11 March 2019, Alperton filed a second appeal, from an RJ Court order scheduling the Creditors Meeting to vote on the RJ Plan for 25 March 2019, and sought interim relief in the form of suspension of the Creditors Meeting pending a decision on its appeal and parallel appeals by the Public Prosecutor and PIMCO.  The Public Prosecutor raised objections to jurisdiction and substantive consolidation of claims similar to those raised by Alperton, but not ownership of the Disputed Shares. On 13 March 2019, the Court of Appeals suspended the Creditors Meeting until the Court of Appeals had decided the Public Prosecutor's appeal.

46.  By email dated 20 March 2019, the Respondents notified the Tribunal that a Brazilian appeals court, partially granting a request by Alperton, had suspended the 25 March 2019 initial Creditors' Meeting (at which a vote might be taken on Constellation's reorganization plan) pending a decision on an appeal by the Public Prosecutor's office of certain decisions by the judge overseeing the bankruptcy.  The Respondents also relayed that a hearing or "judgment session" on that appeal was scheduled for 26 March 2019 and, if the Creditors' Meeting were to be permitted to go forward, it likely would be rescheduled on 15 days' notice.

47.  The Court of Appeals heard the Public Prosecutor's appeal on 26 March 2019.  The Court ruled orally on the same day that the RJ Court lacked jurisdiction over three Constellation affiliates without significant assets in Brazil (Olinda Star Ltd, Arazi S.a.r.l. and Lancaster Projects Corp).  The Court held that the restructuring could not proceed with consolidation of all assets and liabilities of each RJ debtor, unless the creditors decide otherwise.   According to Constellation's Brazilian counsel, Constellation intends to pursue an appeal.[15]

48.  On 9 April 2019, the RJ Court in Brazil granted Constellation's application to move the Creditors Meeting to 30 April 2019 (first meeting) and 9 May 2019 (potential second meeting).   The Claimant informed the US Bankruptcy Court of the postponement on the same day and the Tribunal on 11 April 2019.

## III.   PROCEDURAL HISTORY

### A.   Procedural History Through the Interim Order of 8 April 2019

49.  On 7 August 2018, the Claimant filed its Request for Arbitration pursuant to Article 4 of the ICC Rules of Arbitration effective as of 1 March 2017 (the "**ICC Rules**") with the Secretariat and nominated Mark Kantor as its party-appointed arbitrator.  On the same day, the ICC Secretariat confirmed receipt and that, pursuant to Article 4(2) of the ICC Rules, these proceedings commenced on that date.

---

[15] Galdino & Coelho letter of 29 March 2019, at 2.

50.    On 14 September 2018, the Respondents filed their Answer to Request for Arbitration and Counterclaims pursuant to Article 5(1) of the ICC Rules and jointly nominated Daniel Jackson as their party-appointed arbitrator (the "**Answer and Counterclaims**")

51.    On 18 September 2018, the Respondents having raised a plea pursuant to Article 6(3) of the ICC Rules, the ICC Secretariat informed the Parties that the Tribunal will decide the plea after providing an opportunity for comment.

52.    On 26 September 2018, by joint letter, the Parties notified the ICC Court of their agreement that the total cumulative amount in dispute in the claims and counterclaims is US$ 381,339,450.00.

53.    On 18 October 2018, pursuant to Article 5(6) of the ICC Rules, the Claimant filed its Reply to the Counterclaims.

54.    On 24 October 2018, pursuant to Article 13(2) of the ICC Rules, the Secretary General of the ICC Court confirmed Mr Kantor as co-arbitrator upon the Claimant's nomination and Mr Jackson as co-arbitrator upon the Respondents' joint nomination, and by letter of the same date the ICC Secretariat informed all concerned of such confirmation.

55.    On 31 October 2018, pursuant to Article 37(2) of the ICC Rules, the ICC Court fixed the advance on costs at US$ 700,000 subject to later adjustments.   The ICC Secretariat informed all concerned of the same by letter of 1 November 2018.

56.    On 13 December 2018, the ICC Secretariat noted that the Parties had failed jointly to nominate the Tribunal President by their agreed deadline.

57.    On 19 December 2018, pursuant to Article 13(3) of the ICC Rules, the ICC Court appointed Professor Lucy Reed as President of the arbitral tribunal upon the proposal of the US National Committee, and by letter of the same date the ICC Secretariat informed all concerned of such appointment.

58.    On 19 December 2018, pursuant to Article 16 of the ICC Rules, the ICC Secretariat transmitted the file to the Tribunal.

59.    On 20 December 2018, Mr Kantor supplemented his disclosures by noting that he had met Professor Reed at professional events and has a friendly professional relationship with her.  The Parties made no comments thereafter.

60.    On 24 December 2018, the Tribunal President wrote to the Parties asking for brief summaries of their positions for the draft Terms of Reference, on a without prejudice basis, by 7 January 2019.  The Parties were also requested to consult on possible dates for the Case Management Conference and revert to the Tribunal by 7 January 2019.

61.    On 7 January 2019, the Claimant notified the Tribunal that it had retained White & Case to act as co-counsel alongside Galdino & Coelho Advogados.

62.     In its 7 January 2019 letter, the Claimant also stated it "*is not at liberty to respond to the substance of the* [the Tribunal President's 24 December 2018] *email (or to take further substantive actions in the arbitration) at this time as a result of a recent stay granted by the United States Bankruptcy Court for the Southern District of New York of all pending proceedings with respect to Constellation in the United States, including ICC Case No. 23856/MK.*"   Counsel advised that this stay was in connection with efforts of certain debtors to recognize the Brazilian judicial reorganization proceedings instituted by Constellation, its parent and affiliates.  With the letter, counsel enclosed copies of the US Bankruptcy Court's Order Granting Provisional Relief of 11 December 2018 and the notice of a hearing scheduled for 5 February 2019.

63.     On 7 January 2019, the Respondents notified the Tribunal that they had retained Sullivan & Cromwell to replace their original counsel, Cravath Swaine & Moore, and also added Dr Matthias Pitkowitz as an additional representative.  Enclosed with the letter was the Respondents' brief summary of their positions for inclusion in the draft Terms of Reference, on a without prejudice basis.

64.     On 7 January 2019, Mr Kantor disclosed that he was professionally familiar with the new counsel for both sides.   On 8 January 2019, noting the addition of new representatives for both sides, Professor Reed made disclosures concerning her professional familiarity with White & Case and Sullivan & Cromwell.  On that date, Mr Jackson disclosed that he was professionally familiar with the new counsel for both sides.  The Parties made no comments thereafter.

65.     By Procedural Directive dated 8 January 2019, the Tribunal noted the Order of the US Bankruptcy Court and invited the Respondents to submit any observations on the 7 January 2019 letter from the Claimant by 11 January 2019.

66.     On 10 January 2019, the Respondents informed the Tribunal that: (*i*) they were obtaining bankruptcy advice; (*ii*) the Claimant had invited discussions concerning "*how to lift the stay that it views as in effect so as to allow this arbitration to proceed*"; and (*iii*) were considering requesting related interim relief from the Tribunal.  The Respondents suggested that the Tribunal "*allow the parties to confer further on the effect of the purposed stay and any procedures necessary or advisable to address it, and revert in due course to the Tribunal.*"

67.     On 12 January 2019, the Tribunal requested a joint report from the Parties on the import of the purported stay by 21 January 2019.

68.     On 18 January 2019, the ICC Secretariat:  (*i*) acknowledged Sullivan & Cromwell and Dr Pitkowitz as the new representatives for the Respondents, replacing Cravath Swaine & Moore; (*ii*) acknowledged White & Case as additional representatives for the Claimant; (*iii*) and informed the Parties and the Tribunal that the time limit for establishing the Terms of Reference under Article 23(2) of the ICC Rules had been extended by the Court until 28 February 2019.

69.     On 22 January 2019, counsel for the Claimant reported to the Tribunal that the Parties were discussing the terms of an agreed order with respect to the stay to submit to the US Bankruptcy Court and would keep the Tribunal informed.

70.    On 28 January 2019, the Tribunal President circulated draft Terms of Reference to the Parties.

71.    On 11 February 2019, the Respondents notified the Tribunal that the US Bankruptcy Court had lifted the stay for this arbitration, and provided a copy of the Court's Amended Order Granting Provisional Relief of 8 February 2019.

72.    Also on 11 February 2019, the Respondents submitted their Application for an Award of Interim Measures, with the Declaration of Newton Lins de Noronha.

73.    On 14 February 2019, the Respondents' representatives informed the Tribunal of the Parties' agreement that, if possible, they would like to receive a decision on the Application for Interim Measures before 25 March 2019, the date scheduled by the Brazilian Court for the first Creditors Meeting.  The Parties jointly inquired whether the Tribunal could conduct a telephone hearing on the Application for the Interim Measures during the week of 18 March 2019 "*or on some earlier date that would permit adequate briefing and time for decision*."

74.    On 15 February 2019, the Tribunal President requested the Claimant to provide its brief summary of positions for inclusion in the draft Terms of Reference, and proposed a hearing date (by telephone) for 21-22 March 2019.

75.    On 15 February 2019, the ICC Secretariat again invited the Parties to pay the balance of the advance on costs fixed at US$ 700,000.

76.    On 19 February 2019, the Respondent submitted a revised Application for Interim Measures, with minor corrections.

77.    Also on 19 February 2019, the Parties submitted their comments on the proposed dates for the hearing on the Application for Interim Measures.

78.    On 20 February 2019, the Parties submitted their agreed briefing schedule with respect to the Application for Interim Measures.

79.    On 21 February 2019, the Tribunal President wrote to the Parties proposing a hearing in person on 22 March 2019 (with Mr Jackson appearing by Skype) or by telephone conference on 21 or 22 March 2019.  The President also asked counsel to consider options for the form of the Tribunal's decision on the Application for Interim Measures, noting that if the decision were to be in the form of an award, time would need to be allowed for scrutiny by the ICC Court.

80.    On 22 February 2019, the Claimant's counsel informed the Tribunal that they would consult with the Respondents' counsel concerning the hearing and the form of the decision on the Application for Interim Measures.  The Claimant also submitted the summary of claims and relief to be included in the draft Terms of Reference, on a without prejudice basis.

81.   On 28 February 2019, the Claimant submitted its Opposition to the Application for Interim Measures, with the Witness Statements of Luke A. Barefoot and Gavin Kagan.

82.   Also on 28 February 2019, the ICC Secretariat informed the Parties and the Tribunal that the time limit for establishing the Terms of Reference under Article 23(2) of the ICC Rules had been extended by the Court until 29 March 2019.

83.   By letter dated 5 March 2019, the Parties expressed their preference for a hearing on the Application on Interim Measures in person in New York on 22 March 2019 starting at 2:00 pm (with Mr Jackson appearing remotely).  They also requested the Tribunal to "*indicate its result in an order <u>before 25 March</u>, with or without a summary of its reasons, with an interim award to follow as soon as possible, preferably within 2-4 weeks, in order to ensure that the award may be available in the ongoing bankruptcy proceedings in the US and Brazil*" (emphasis in original).

84.   Also on 5 March 2019, the Claimant wrote to the Tribunal and the ICC Secretariat to ask for confirmation that the hearing on the Application for Interim Measures would not proceed unless the Respondents had paid their share of the advance on costs by 18 March 2019.

85.   On 8 March 2019, the Respondents wrote to the Tribunal and the ICC Secretariat to object to the Claimant's letter requesting that the hearing not go forward and to request a payment schedule regarding their portion of the advance on costs.

86.   On 8 March 2019, the ICC Secretariat wrote to the Parties that because the time limit for payment of the advance on costs set for 18 March 2019 has not yet expired, the Secretariat was not in a position to invite the Secretary General to examine whether to apply Article 37(6) of the ICC Rules and direct the arbitral tribunal to suspend work on the matter.  The Secretariat informed the Parties that it would invite the Court to examine Respondents' request for payment of their share of the advance on costs in installments.

87.   On 11 March 2019, the Respondents submitted their Reply in Support of Application for an Award of Interim Measures.

88.   On 12 March 2019, the Claimant wrote to the Tribunal and the ICC Secretariat to maintain its request that the Tribunal confirm that the hearing on the Respondents' Application for Interim Measures would not proceed unless the Respondents had paid their share of the advance on costs by 18 March 2019.  The Claimant also objected to the Respondents' request for a payment schedule.

89.   On 12 March 2019, the ICC Secretariat acknowledged receipt of the payment by the Claimant of the balance of its share of the advance on costs.

90.   On 14 March 2019, the ICC Secretariat informed the Parties that the Court had authorized the Respondents' payment of their share of the advance on costs in ten monthly installments of US$ 35,000 from 21 March to 31 December 2019.  Any installment not paid according to the schedule will render the full remaining balance of the Respondents' share of the advance on costs due.

91.    On 15 March 2019, the President issued Procedural Order No. 1 scheduling the hearing on the Application for Interim Measures for 22 March 2019 in New York City at a venue to be arranged by the Parties.

92.    On 18 March 2019, the Claimant filed its Rejoinder in Opposition to Application for Interim Measures, with the Witness Statement of Guilherme Lantimant and the Second Witness Statement of Gavin Kagan.

93.    Despite the suspension of the initial Creditors' Meeting from 25 March to 8 April 2019, the Parties agreed in an email exchange on 20 and 21 March 2019 to proceed with the hearing on the Application for Interim Measures on 22 March 2019.  The Parties also agreed to hold the hearing at the offices of White & Case.

94.    On 22 March 2019, the ICC Secretariat acknowledged receipt of US$ 35,000 from the Respondents as the first installment of their share of the advance on costs.

95.    The Hearing took place as scheduled on 22 March 2019 at the offices of White & Case.  In attendance for the Claimant were:  Paul Friedland, Damien Nyer, John Cunningham, Philip Abelson, Clemency Wang and Andrea Amulic from White & Case; Flavio Galdino and Isabel Picot from Galdino Coelho Advogados; and Fabrizzie Chinalglia from Constellation.  In attendance for the Respondents were: Joseph Neuhaus, Andrew Finn, Maria Slobodchikova, Inbar Gal and Elizabeth Miller from Sullivan & Cromwell; Dr Matthias Pitkowitz; and Newton Lins de Noronha from Alperton.

96.    The Tribunal heard oral submissions from the Parties' representatives from approximately 2:00 pm to 6:00 pm.

97.    The Parties jointly informed the Tribunal that certain appeal proceedings were being heard in Brazil on 25 March 2019, and confirmed that the Creditors Meeting had been postponed from 25 March to (at least) 10 April 2019.

98.    The transcript of the hearing on 22 March was circulated on 25 March 2019.

99.    At the request of the Tribunal during the hearing, the Parties submitted additional information on the status and import of the RJ Proceedings in correspondence between 27 March and 2 April 2019.

100.   On 3 April 2019, for good order, the ICC Secretariat informed the Parties and the Tribunal that at its session of 7 March 2019 the Court had extended the time limit for establishing the Terms of Reference under Article 23(2) of the ICC Rules until 30 April 2019.  In the same letter, the ICC Secretariat stated that, pursuant to Article 31(1) of the ICC Rules, the time limit of six months within which the Tribunal must render the final award started to run on 22 March 2019, the date on which the Terms of Reference were signed.

101.   By letter dated 5 April 2019, the Claimant informed the Tribunal that the Respondents had written to the Registered Agent of the Drillship Companies on 13 March 2019 to demand that he amend the Register of Members to reflect Alperton's ownership

interest in and refrain from implementing any further pledge of the Disputed Shares, and to reserve the right to bring action against him and others to recover damages Alperton might suffer from breach of duty to Alperton.  The Claimant objected that the Respondents' counsel had not notified the Tribunal of this action and were attempting to subvert the Tribunal's jurisdiction.  The Claimant further informed the Tribunal that the "*Respondents continue to avail themselves of procedural avenues in Brazil to assert their claimed rights*," including by filing a motion with the RJ Court on 3 April 2019 to postpone the Creditors Meeting then scheduled for 10 April 2019.

102.  By email dated 6 April 2019, the Respondents' counsel denied that there was any attempt to subvert the Tribunal's jurisdiction in the Respondents continuing "*to pursue their rights informally with third parties or make third parties aware of potential liability.*"  The Respondents further denied that they had a duty to inform the Tribunal of all such efforts, although they would inform the Tribunal if they were to obtain any relief from third parties or Constellation.  The Respondents also confirmed that there had been no ruling on the applications of Alperton and PIMCO to postpone the Creditors Meeting, which remained scheduled for 10 April 2019.

103.  On 8 April 2019, the President of the Tribunal acknowledged receipt of the 5 and 6 April 2019 correspondence and informed the Parties that no further submissions were required.

104.  The proceedings on the Application for Interim Measures stood closed as of 8 April 2019.

**B.    The Interim Order of 8 April 2019 and Subsequent Procedural History**

105.  On 8 April 2019, the Tribunal issued its Interim Order on the Respondents' Application for Interim Measures.

106.  The Disposition in the Interim Order provides as follows:

*For the reasons set forth above, the Tribunal **ORDERS** as follows:*

1. *The Respondents' Application for Interim Measures is granted in part, as follows:*

   a. *The Claimant shall refrain from pledging, transferring or otherwise encumbering the Disputed Shares in the Drillship Companies, pending a final Award;*

   b. *The Claimant shall refrain from pledging, transferring or otherwise encumbering the underlying assets of the Drillship Companies other than in the ordinary course of their business, pending a final Award;*

   c. *The Claimant shall give Alperton adequate notice, in all cases no less than 30 days' notice, of any contemplated Fundamental Business Decisions, as defined in Clause 4.9 of the Shareholders' Agreements (or any other decision requiring unanimous*

*Shareholder or Board approval under the Shareholders' Agreements), pending a final Award.*

2. *The Respondents' Application for Interim Measures is denied insofar as the Respondents seeks an order that the Claimant refrain from declaring and paying dividends or capital distributions.*

3. *The Tribunal grants the Claimant's request for security for damages in the amount of US$ 33.4 million for the additional and incremental costs that the Constellation Group is likely to incur as a result of the predicted further delay in the restructuring, in specific, costs for (i) professional fees, estimated at US$ 26.4 million for six months; and (ii) the termination fees of US$ 7 million to which the Constellation Group is subject under the Amended PSA for failure to implement the cross-collateralized restructuring.  The Respondents are ordered to provide this security in the form of a bond to be issued by an independent financial institution in New York City having at least an investment grade rating or equivalent, the detailed terms of which are to be agreed by the Parties, subject to approval by the Tribunal.*

4. *The Respondents are further ordered to provide to the Claimant a written unsecured undertaking to be responsible for the costs and damages in excess of the bond ordered in paragraph 3 above, to the extent and in the amounts proven to the Tribunal.*

5. *The interim measures ordered in the Respondents' favor are **immediately effective,** subject to dissolution in 10 days unless the Tribunal is satisfied that the Respondents have posted a proper bond and provided a proper written unsecured undertaking in favor of the Claimant, as ordered in paragraphs 3 and 4 above.*

6. *If interest is to accrue on the consolidated debtors' outstanding financial indebtedness following the filing of the RJ Petition, the Tribunal is inclined to order the Respondents to post security for such interest in the form of a bond, having terms similar to that set out in Annex B and agreed by the Parties, subject to approval by the Tribunal.  The Parties are to advise the Tribunal promptly if such post-Petition interest is accruing.*

7. *The issue of assessment of costs for the Application for Interim Measures is reserved for the final Award.*

107. By email dated 10 April 2019, the Claimant acknowledged receipt of the Interim Order, confirmed that interest is accruing on the Constellation Group's outstanding financial indebtedness, and projected that the accrued interest will total US$ 159.5 million over the next 12 months.   The Claimant provided Houlihan Lokey's calculations of the accruing interest.

108. By later email dated 10 April 2019, the Respondents reported that the RJ Court had on 9 April 2019 "*granted the application of Constellation to move the creditors meeting to April 30 (first meeting) and May 9 (potential second meeting)*" and that

Constellation had so notified the US Bankruptcy Court of that postponement. The Respondents requested the opportunity to respond by 12 April 2019 to the Claimant's assertions regarding accrued interest.

109.   On 11 April 2019, the Claimant confirmed that the Creditors Meeting had been postponed to 30 April 2019, after Constellation "*requested such an adjournment in light of the Tribunal's Order of April 8.*"  As for next steps, the Claimant wrote:

> *As regards the question of the interest running on the Constellation Group's consolidated debt, since the matter was clearly identified in the Tribunal's Order, we are surprised that Respondents would need until* [12 April] *to advise their position.  Given that Respondents' failure to provide security for such interest may be an additional reason for the dissolution of the Order, Constellation will object to any further delay by Respondents in the resolution of this matter.*

110.   By email dated 12 April 2019, the Tribunal acknowledged receipt of the Parties' email exchange of 10 and 11 April 2019, and directed as follows:

> *As concerns the Respondents' (1) bond for additional/incremental costs and (2) written unsecured undertaking, as ordered in paragraphs 3 and 4 of the Disposition in the Interim Order of 8 April 2019, the Tribunal does not anticipate receiving any submissions or information regarding the bond or undertaking except in connection with approval of the terms agreed by the Parties, to allow posting of the bond by 18 April 2019.*
>
> *The Tribunal accepts the Respondents' request to respond by COB (New York) on 12 April 2019 to the Claimant's 10 April email (with Houlihan Lokey calculations) concerning a bond as security for interest reportedly accruing on the Constellation Group's consolidated debtors' outstanding financial indebtedness.  We expect the Parties to consult directly to finalize the terms for this bond, pursuant to paragraph 6 of the Disposition and Annex B of the Interim Order.  For the avoidance of doubt, the Tribunal has not yet issued an order for this bond, and so the Respondents are not obliged to issue a compliant bond by 18 April 2019 to avoid dissolution of the Interim Order.*

111.   On 12 April 2019, the Respondents filed a letter in response to Constellation's email of 9 April 2019 addressing the question of whether interest is accruing on Constellation's financial indebtedness following the filing of the RJ Petition.  The Respondents submit that "*Constellation's assertion that interest is currently 'accruing' on the outstanding financial indebtedness of the Constellation Group at a rate of US$ 159.9 million per year is at best misleading*".[16]  The Respondents also submit that:

> *Any cost borne by Constellation and its creditors because the Tribunal's Interim Order may delay consummation of the particular RJ Plan contemplated by the Plan Support Agreement arises only because Constellation and its creditors chose a plan that apparently did nothing to*

---

[16] Sullivan & Cromwell letter of 12 April 2019, at 1.

*accommodate the jurisdiction of this Tribunal.  Constellation itself initiated this arbitration in August 2018, expressly invoking this Tribunal's jurisdiction to resolve the parties' disputes concerning the Disputed Shares.  Having placed before the Tribunal the question of its right to seize the shares and then proceeded to act so as to prevent the Tribunal from issuing an effective award in any but Constellation's favor, Constellation acted at best irresponsibly and should be held to have assumed the risk of any costs that result from having to change its plans.[17]*

112.   On 16 April 2019, the Respondents filed a request that the Tribunal reconsider and vacate the portion of the Interim Order requiring the Respondents to post a bond for US$ 33,400,000 in order to avoid dissolution of the interim relief granted in the Interim Order ("**Request to Reconsider**").  The Request for Reconsideration included the Second Declaration of Newton Lins de Noronha and the First Declaration of Sergio Lage.

113.   On 17 April 2019, the ICC Secretariat informed the Parties that it had received a draft award from the Tribunal on 15 April 2019, and that the ICC Court would scrutinize the draft at one of its next sessions.

114.   On 17 April 2019, the Claimant replied to the Respondents' Request to Reconsider ("**Reply to Request to Reconsider**").

115.   On 18 April 2019, in order to be able to consider fully the Parties' submissions on the Request to Reconsider before the Creditors Meeting rescheduled for 30 April 2019, the Arbitral Tribunal issued an Amendment to the Interim Order extending the deadline for the dissolution of the interim relief in the Interim Order for a further 10 days, from 18 April to 28 April 2018.  In specific, the Tribunal amended paragraph 5 of the Disposition of the Interim Order, with immediate effect, as follows:

> *The interim measures ordered in the Respondents' favor are **immediately effective,** subject to dissolution on **28 April 2019** unless the Tribunal is satisfied that the Respondents have posted a proper bond and provided a proper written unsecured undertaking in favor of the Claimant, as ordered in paragraphs 3 and 4 above.*

116.   The Tribunal includes its decision on the Request to Reconsider in this Interim Award.

## IV.   THE PARTIES' POSITIONS

### A.   The Respondents' Case

117.   In summary, the Respondents' case on the merits is that the vote on the Disputed Cash Calls in the 7 August 2018 Board meeting was not a valid Deadlock, because –

---

[17] Sullivan & Cromwell letter of 12 April 2019, at 3.

in addition to being called without notice and without the Alperton Directors having received full information – the request to approve the Disputed Cash Calls concerned only prior accounting and operations of the Drillship Companies rather than prospective "*requests for cash calls*" for ongoing operations that would validly constitute Fundamental Business Decisions under Clause 4.9 of the SHAs. Disputes over the Disputed Cash Calls, say the Respondents, are to be resolved by arbitration under Clause 18.3 of the SHAs and, indeed, Constellation instituted this arbitration to that end.

118. Further, Constellation breached its obligation under Clause 4.8 of the SHAs to procure that its Directors "*act in good faith and in the best interests of the Company in exercising their votes*," as evidenced by the timing of the vote, which allowed Constellation to engineer a false Deadlock in order to transfer ownership of Alperton's 45% shareholdings in the Drillship Companies to itself for nothing and demand payment of the wrongfully inflated Delba Carried Loans. The goal, say the Respondents, was to enable Constellation and its affiliates to file the RJ Petition in Brazil after months of undisclosed negotiations, in further breach of the SHAs by not obtaining the consent of (or even informing) Alperton of what is a Fundamental Business Decision under Clause 4.9, and seek to pledge and encumber 100% of the shares in the Drillship Companies as if those shares were Constellation's own.

119. In their Answer and Counterclaims, the Respondents request the Tribunal to, among other things, declare that Constellation has breached the SHAs, reduce the alleged balance of the Delba Carried Loans to zero, "*issue an award declaring that the Deadlock Sale Price is a positive number to be fully established during the proceedings, but preliminarily estimated to be at least US$ 381,339,450,*" and "*issue interim relief preventing Constellation, its parent entities or other of its affiliates from (1) pledging the Drillships as collateral in respect of any debt not directly associated with the Companies and (2) causing the Companies or their subsidiaries to assume any obligations or liabilities in connection with indebtedness owed by other affiliates of Constellation.*"

120. In their Application for Interim Measures, the Respondents request the following relief:

    i.    *an interim award ordering Constellation to (1) refrain from pledging, transferring, or otherwise encumbering Alperton's shares in the Drillship Companies, (2) refrain from pledging, transferring or otherwise encumbering the underlying assets of the Drillship Companies other than in the ordinary course of their business, (3) refrain from declaring and paying dividends or capital distributions, and (4) give Alperton adequate notice, but in all cases no less than thirty days' notice, of any contemplated Fundamental Business Decisions, as defined in Section 4.9 of the Shareholders' Agreements (or any other decision requiring unanimous Shareholder or Board approval under the Shareholders' Agreements), pending a final award in this arbitration;*

    ii.    *an order providing the same relief pending the decision on this Application, in order to ensure that the Application itself is not rendered moot before it can be decided;*

> iii.    an award of the costs of this application, including Respondents' attorneys' fees and other costs as permitted by the SHAs; and

> iv.    any other relief that the Tribunal deems just and proper.

121.    The Respondents confirmed during the Hearing that they are not pursuing the temporary relief requested in paragraph 120(*ii*) above, because, even pending an interim order or award, Constellation cannot take action concerning the relevant shares before the Creditors Meeting in Brazil.

122.    According to the Respondents, the interim relief requested will "*preserve the status quo until this Tribunal can decide the ownership of the Disputed Shares, while permitting Constellation the ability to continue to operate the Drillship Companies for the benefit of both parties.*"[18]

### 1)   Applicable Standard for Interim Measures

123.    As for the standard for granting interim measures, the Respondents cite Article 28(1) of the ICC Arbitration Rules, which authorizes an arbitral tribunal to "*order any interim or conservatory measure it deems appropriate.*"    According to the Respondents, tribunals typically grant interim measures upon a showing that:  (*i*) the applicant has a *prima facie* claim and a *prima facie* case on the merits; (*ii*) there is an imminent threat of substantial or irreparable harm or prejudice to the applicant's rights capable of being protected by the tribunal; and (*iii*) the balance of hardships weighs in favor of interim measures.[19]

### 2)   *Prima Facie* Claim and Case on the Merits

124.    Turning to the first element of the test, the Respondents argue that the Tribunal has *prima facie* jurisdiction over the present dispute pursuant to Section 18.3 of the SHAs. Both Parties have filed claims in the arbitration concerning the Deadlock vote and the value of the Drillship Companies and Delba Carried Loans.

125.    The Respondents argue that Alperton has a strong *prima facie* case on the merits of its underlying claims.    Citing commentary, the Respondents argue that the party requesting interim measures only need "*satisfy the tribunal that the moving party has, with reasonable probability, a case or, alternatively, to determine that the claim is not frivolous or vexatious.*"[20]   They contend that Alperton's claims are neither frivolous nor vexatious and that there is more than a mere reasonable probability that there is a valid case on the merits.

126.    Even if the *prima facie* standard is set higher and Alperton is required to show that it is likely to succeed on the merits of its claim, the Respondents contend that they can satisfy that standard for three reasons.

---

[18] Application, para 46.
[19] Application, para 47.
[20] Yesilirmak, *Provisional Measures*, § 5-28 (RLA-1).

127. First, Constellation's claim that it is entitled to buy the Disputed Shares is based on its assertion that a Deadlock occurred because of the Board's failure to reach a unanimous agreement at the 7 August 2019 Board Meeting to ratify the Disputed Cash Calls. However, only Fundamental Business Decisions – which are limited to a list of specific decisions relating to the ongoing operations of the Drillship Companies, including "*requesting cash calls*" outside the annual budget – can trigger a valid Deadlock, while all other disputes must be resolved through arbitration. The Respondents argue that ratifications of past – versus prospective – cash calls are not Fundamental Business Decisions, because they only deal with the validity of past accounting decisions and disputes concerning past Constellation conduct. As submitted by the Respondents' counsel at the Hearing:

> *A retroactive ratification cash call, about which there is a dispute between the parties as to whether this were bona fide in the past, is not a request for cash calls. It has nothing to do with the ongoing operations. That money has already been called for and loaned or supplied. A request for cash call is not the same as ratifying actions or accounting decisions in the past.[21]*

128. Second, the Respondents argue that Constellation failed to provide Alperton with the advance written notice required by Clause 4.5 of the SHAs prior to the ratification vote. That vote therefore was incapable of triggering a valid Deadlock.

129. Third, the Respondents argue that the Directors' failure unanimously to ratify the Disputed Cash Calls could not have triggered a valid Deadlock, because Constellation's refusal to provide the Alperton Directors with sufficient information to analyze those Cash Calls rendered it impossible for Alperton to comply with its duties under the SHAs. In specific, under Clause 4.8 of the SHAs, the Directors are obliged to act in good faith and in the best interests of the Companies, which the Alperton Directors could not do given their unanswered concerns about the legitimacy of the Disputed Cash Calls.

130. The Respondents also contest the Claimant's arguments (set out below) that the Respondents cannot show likely success on the merits, because, even if there had been no Deadlock on the Disputed Cash Calls, Constellation could have deprived Alperton of its 45% equity interest in the Drillship Companies. Among other points, the Respondents disagree that the project lenders would have foreclosed on the Drillship shareholders if – without the infusions through Cash Calls approved at the 7 August 2018 Board meeting – the Drillship Companies had defaulted on the project loans. This is because, even on the Claimant's own evidence of the lowest valuations, the remaining project loans of approximately US$ 260 million were far lower than the estimated US$ 580 to 680 million of Drillship Company assets, and hence foreclosure would be economically irrational.

131. The Respondents also disagree that Constellation could have readily triggered a separate Deadlock vote on the restructuring as a Fundamental Business Decision under Clause 4.9 of the SHAs, or transferred the Disputed Shares to itself after Alperton defaulted on the Delba Carried Loans in September 2018 and then voted

---

[21] Hearing Transcript ("**TR**"), at 31:11-21.

100% of the shares in favor of the restructuring.  As submitted by the Respondents' counsel at the 22 March 2019 hearing:

> *I submit that the evidence clearly shows that Constellation's plan to pledge the drillships to its lenders in support of a restructuring of its own debt was pursued in breach of its duty to act in the best interest of the parties' joint venture.*
>
> *Constellation's primary answer to all of this is to argue they could have taken the shares anyway in payment of the Delba loans, either in a new deadlock vote or by foreclosing on its loans.  But that "could have/should have" argument ignores, one, Constellation's New York law fiduciary duties, which require a majority shareholder operating under good-faith best-interests standards, as required by the contract here, to act fairly in squeezing out minority shareholders.*
>
> *It ignores Alperton's rights to make its own decisions in any properly called deadlock vote, and it ignores the serious questions that have been raised, even on a preliminary record, about the amount of the expenses that Constellation ran up, largely in related-party transactions, in operating the joint venture's two ships.[22]*

### 3)  Imminent and Irreparable or Substantial Harm

132.  As for the second element of the test, which goes to imminent and substantial harm, the Respondents argue that ICC tribunals typically require applicants to show that requested interim measures are urgently necessary to prevent irreparable or otherwise substantial harm.[23]   According to the Respondents, unlike some domestic jurisprudence, an applicant before an ICC tribunal need not show that the potential harm it faces will be irreparable, and not remediable by monetary damages, but rather merely "substantial" or "serious."[24]   Urgency is shown, say the Respondents, if the substantial or serious harm alleged would occur before a final Award could be issued.

133.  The Respondents contend that they will suffer substantial harm if the Disputed Shares are not protected from distribution in the RJ Proceedings.  The Respondents assert that, if Constellation is allowed to restructure its debts by using the Disputed Shares and related Drillship Company assets as collateral, without having obtained the consent of (or even informing) Alperton as required under the SHAs, to cross-subsidize its insolvent affiliates, the value of the Disputed Shares and assets is likely to be irrevocably diminished, causing substantial harm.

134.  The Respondents argue that the loss of a unique asset such as the Drillship Companies has routinely been recognized as sufficient to meet even the higher standard of irreparable harm.[25]   Citing previous ICC awards, the Respondents further argue that the potential disposal or encumbrance of assets prior to the resolution of a dispute as

---

[22] TR, at 10:8-25 and 11:2-4.
[23] Interim Award, ICC Case No 12361 at 62 (RLA-4).
[24] Application, para 54, citing ICC Final Award 5804 of 1989 (RLA-10).
[25] Application, para 56, citing *Destiny USA Holdings LLC v. Citigroup Global Mkts. Realty Corp.*, 2009 WI. 2163483, at *6 (N.Y. Sup. Ct. July 17, 2009) (RLA-16).

to ownership of those assets is clearly a substantial harm for the purposes of interim measures.[26]

135.    The Respondents say that, not only are the Drillships unique assets, Constellation is insolvent and unable to meet its current debts.  Without the protection of interim relief, if the Tribunal issues a final Award in favor of the Respondents, they will not be able to recover the substantial lost value of the Disputed Shares.  Once there is a Brazilian court order confirming the proposed restructuring plan, and third party lenders have advanced funds in reliance thereon, it will be effectively impossible for the Respondents to recover the Disputed Shares or their value.

136.    According to the Respondents, the RJ Court's granting the Public Prosecutor's appeal on 26 March 2019 means that:

> *Each company's creditors will, therefore, need to vote separately in favor of the RJ Plan by the requisite proportion, but the Companies would continue to be part of the RJ Plan.  Constellation presumably will need to amend the RJ Plan to reflect the fact that three entities and their assets are to be excluded.  Given prior creditor support for the consolidated RJ Plan, it is likely that the creditors will vote to proceed with a revised RJ Plan on a consolidated basis.[27]*

137.    As to the requirement that the potential harm be imminent, the Respondents emphasized that the Creditors Meeting was initially scheduled for 10 April 2019 (now postponed to 30 April).  Assuming the proposed restructuring plan is approved, it will go into effect upon court confirmation, which is likely to occur very shortly after the Creditors Meeting.  Counsel for both sides, and Justice Rezek, agree that if the creditors vote to approve the RJ Plan, it cannot be implemented or enforced prior to court confirmation.  According to Constellation's Brazilian counsel, the confirmation process normally is a "*very fast proceeding*" and takes only a few "*days or a week*".[28]

138.    Alperton's counsel report that, once the RJ Court confirms the RJ Plan, Brazilian law would allow Constellation to implement all transactions under the RJ Plan, including transferring and encumbering the Disputed Shares.  In counsel's words:

> *If no interim relief is granted by the Tribunal, Alperton's ability to challenge the approval of the RJ Plan is likely to be severely limited.  While Alperton may appeal the confirmation of the RJ Plan as an interested party, such an appeal would not stay the RJ Proceeding or the consummation of transactions under the RJ Plan.  Moreover, these appeals are often lengthy, sometimes lasting multiple years before a final decision is reached.*

> *Further, the extent to which the confirmation of the RJ Plan would be subject to challenge in a new proceeding is unclear.  While there is no law barring such an attack, or the unwinding of a confirmed reorganization plan on appeal or transactions made pursuant to such a plan (including a pledge of the Companies' shares), Brazilian counsel is aware of no precedent in which a*

---

[26] Interim Award, ICC Case No 12361 at 62 (RLA-4).
[27] Sullivan & Cromwell letter of 27 March 2019, at 3.
[28] TR, at 73:14-18.

> *Brazilian court ordered shares that had been transferred or encumbered by a third-party lien pursuant to a confirmed judicial reorganization returned to their rightful owner free and clear of the encumbrance.  Moreover, there would be significant practical impediments to unwinding transactions consummated pursuant to the RJ Plan:  the rights of third parties who advanced money would be affected and the change might constitute a breach of Constellation's new financing arrangements.  As a practical matter, Alperton believes it would be extremely difficult for a court to order such relief.*[29]

### 4)  Balance of Hardship Between the Parties

139.   Turning to the final element of the test for interim measures, which requires the Tribunal to balance the relative hardship between the Parties if interim relief is granted, the Respondents argue that the balance clearly tips in their favor.  The Respondents explain that their goal is to preserve the status quo as it existed when Constellation filed its Request for Arbitration, at which point the Disputed Shares remained with Alperton.  They highlight that they have no intention of interfering with a legitimate reorganization of Constellation and its affiliates, but it was Constellation that chose to propose the current restructuring plan without giving its creditors full information about the valid ownership of the Drillship Companies.

140.   In the circumstances, conclude the Respondents, it is not unfair for Constellation to shoulder the risk that the Tribunal might decide in Alperton's favor and enjoin Constellation from pledging, transferring or encumbering the Disputed Shares.  Constellation's creditors will have the opportunity to price the risk that Constellation may not own the Disputed Shares into the cost of their financial arrangements.  In comparison, it would be unfair to force the Respondents to bear the risk that the Disputed Shares will be irrevocably appropriated and pledged to third parties without its consent, before the Tribunal is able to resolve the dispute as to the ownership of the Disputed Shares in a final Award.

141.   The Respondents also allege that it is necessary, in order to ensure that Constellation does not abuse its control of the Drillship Companies, that the Tribunal order Constellation to provide Alperton with advance notice of any contemplated Fundamental Business Decisions to allow the Respondents to raise the relevant issue with the Tribunal.  In a footnote, the Respondents also support their request for an order barring Constellation from declaring or paying dividends before issuance of a final Award, which should not be payable before the Drillship Companies' debts are paid in full, on grounds that Constellation and the Companies' lenders nonetheless might agree to pay dividends.[30]

### 5)  Security for Costs and Damages

142.   In their Reply, the Respondents object to the Claimant's request for security for costs and damages in amounts as high as US$ 700 to 800 million, labeling it a request to "*backstop Constellation's own restructuring*."[31]  Further, the Respondents' counsel

---

[29] Sullivan & Cromwell letter of 27 March 2019, at 4-5.
[30] Application, para 59, footnote 20.
[31] Respondents' Reply in Support of Application for an Award of Interim Measures ("**Reply**"), para 60.

submitted at the Hearing that "*a requirement of security would permit Constellation to snub its nose at the Tribunal's award because Alperton would not be in a position to post a substantial security in short order.*"[32]

143.    In their Request for Reconsideration, the Respondents argue that there is good cause for the Tribunal to vacate the bond order or otherwise continue the relief entered against Constellation in the Interim Order.   The Respondents present four main arguments in support of the Request for Reconsideration.

144.    First and foremost, the Respondents contend that their limited financial resources leave them unable to obtain the bond of US$ 33.4 million ordered by the Tribunal. They report that the Blaikie Group has confirmed that their assets are insufficient to support a bond of more than US$ 500,000[33] and, although Alperton is exploring other options to source a bond, there is no indication that those efforts will be successful.[34] The Respondents submit that New York courts and international arbitral authorities recognize the inequity of denying an applicant access to justice on the basis of financial inability to post a surety bond.[35]

145.    Second, the Respondents argue that any costs that Constellation may incur because of the impact of the Interim Order on the RJ Plan are the result of Constellation's own recklessness, specifically by initiating this arbitration and then negotiating a restructuring plan that does not accommodate the possibility that the Tribunal may rule against it.[36]   The Respondents further argue that Constellation and its lenders have some control over any incremental costs caused by delay resulting from the Interim Order, and hence the estimates of US$ 26.4 million for professional fees over six months and a termination fee of US$ 7 million are not reliable.[37]

146.    Third, in related vein, the Respondents argue that bond security for a US$ 7 million termination fee is excessive.   There is reason to believe that Constellation and its lenders will minimize any delay by renegotiating the RJ Plan to address the inability to pledge Alperton's shares and assets and, if termination were to occur today, the maximum termination fee under the RJ Plan would be only US$ 2.9 million.[38] Constellation also failed to inform the Tribunal that, under the RJ Plan, there would be no fee if termination results from a court order enjoining or materially altering the plan.

147.    Fourth, the Respondents argue that the harm to Alperton from the bond requirement vastly outweighs any harm to Constellation.   Should the interim relief be dissolved after 28 April 2019 because the Respondents cannot post the bond, Constellation has already indicated it will complete the pledging of the Disputed Shares and related assets notwithstanding the Tribunal's finding in the Interim Order that "*doing so would render any final Award in Alperton's favor effectively unenforceable.*"   In comparison, the damages that Constellation may suffer are very limited, in light of the

---

[32] TR, at 63:2-7.
[33] Respondents' Request for Reconsideration ("**Request for Reconsideration**"), p 5.
[34] Request for Reconsideration, p 5.
[35] Request for Reconsideration, p 3.
[36] Request for Reconsideration, pp 2 and 5.
[37] Request for Reconsideration, p 5.
[38] Request for Reconsideration, p 6.

compelling interest of Constellation and its lenders to renegotiate the RJ Plan swiftly, and also because any bonded amount is unlikely actually to be needed as the "*chance that the Tribunal will conclude that it wrongfully issued the Interim Order is small*."[39]

148.     In their Request to Reconsider, the Respondents confirm that they are prepared to sign a written unsecured undertaking to be responsible for any costs and damages in excess of a reasonable bond, as directed in the Interim Order.

### B.     The Claimant's Case

149.     In brief summary of the Request for Arbitration, the Claimant's case on the merits is that Alperton was content to rely on Constellation both to ensure the ongoing operation and security of the Drillship Companies and to finance the entirety of the Companies' funding needs, until the maturity date of the Delba Carried Loans neared in September 2018 for the *Amaralina Star* and November 2018 for the *Laguna Star* with the end of the Petrobras charters.  According to Constellation, facing outstanding project loans of some US\$ 250 million as of December 2018 and no prospect of renewal of the Petrobras charters to cover that debt, Alperton began challenging cash calls that it had never questioned and seeking detailed information in bad faith.

150.     In the Request for Relief in its Request for Arbitration, the Claimant asks the Tribunal to:

> (*i*)     *Declare the Deadlock Sale Price under the Shareholders' Agreements in an amount to be determined during the course of the proceeding;*
>
> (*ii*)    *Declare that Claimant owes Respondent Alperton zero to purchase Alperton's shares in the Companies and the loans of Alperton in the Companies in accordance with Clause 8.2(a) of the Shareholders' Agreements;*
>
> (*iii*)   *Order Respondents to pay to Claimant the net outstanding amount owed for the Delba Carried Loans based on the Deadlock Sale Price, in an amount to be determined during the course of the proceeding but preliminarily assessed at no less than US\$ 330.3 million;*
>
> (*iv*)   *Award Claimant interest on the principal of the net outstanding amount owed for the Delba Carried Loans, at the contractual interest rate of 12% or 13% as applicable, with the precise amount and date to be determined during the course of the proceeding;*
>
> (*v*)    *Order Respondent Alperton to complete any steps necessary to relinquish its shares and loans in the Companies to Claimant;*
>
> (*vi*)   *Award Claimant the costs associated with these proceedings, including legal fees and expenses (including any expert fees and expenses) and the Arbitral Tribunal's fees and expenses; and*

---

[39] Request for Reconsideration, p 2.

> (vii) *Award Claimant any and all further or other relief as the Arbitral Tribunal may deem appropriate.*

### 1) Applicable Standard for Interim Measures

151. Asserting that ICC tribunals frequently refer to the legal principles of the seat of arbitration for the governing standard for interim measures, the Claimant urges the Tribunal to apply the New York law standard.[40]  Under New York law, a preliminary injunction is warranted only if the applicant can demonstrate:  "*(1) a likelihood of ultimate success on the merits; (2) irreparable injury absent the injunction; and (3) a balance of the equities favoring the applicant's position.*"[41]

152. The Claimant argues, consistent with the extraordinary nature of the relief sought, that the applicant for a preliminary injunction bears a burden of proof that is "*particularly high*",[42] at the level of clear and convincing evidence showing a "*highly probable*" outcome.[43]  If there are disputed facts, says Constellation, the injunctive relief must be denied.

153. Constellation alleges that the Respondents can meet none of the mandatory elements for interim relief, by showing a highly probable outcome based on clear and convincing evidence and undisputed facts.

### 2) *Prima Facie* Claim and Case on the Merits

154. The Claimant contends that Alperton has failed to articulate any legal theory that would entitle it to a return of the Disputed Shares and to bypass the RJ Proceedings. The key reason is that Constellation is the registered owner of the shares in the Registers of Members of the Drillship Companies and, under BVI law, "*entry of the name of a person in the register of members as a holder of a share in a company is prima facie evidence that legal title in the share vests in that person.*"[44]

155. Even if the Respondents could articulate a legal theory in support of their ownership claim, their claim to specific performance in this arbitration would not be available because it is contrary to established bankruptcy policy.  This is because, says the Claimant, property-type remedies in bankruptcy would allow one creditor to obtain preferential treatment over other creditors outside of the bankruptcy proceedings.  As any final Award of this Tribunal must meet bankruptcy policy principles, if there is a final Award in the Respondents' favor, their "*only remedy is an award of damages to be distributed, in an orderly fashion, pursuant to the reorganization plan that is ultimately approved by the Brazilian court and implemented through the Brazilian bankruptcy proceeding.*"[45]

156. Even if the Respondents could get over these hurdles, Constellation contends that they cannot meet the high burden of showing that Alperton is likely to succeed (or even

---

[40] Opposition, para 78.
[41] Opposition, para 81.
[42] Opposition, para 82, citing *Council of the City of N.Y. v. Giuliani*, 248 A.D.2 1, 4 (1st Dep't 1998) (CLA-22).
[43] Opposition, para 82, citing *Kihl v Pfeffer*, 4 A.D.3d 154, 163-64 (2d Dep't 2007) (CLA-47).
[44] Opposition, para 86, citing BVI Business Companies Act (2004) § 42(1) (CLA-33).
[45] Opposition, para 92.

make a strong *prima facie* showing) on a claim for return of the Disputed Shares for three reasons.

157.   First, according to Constellation, Alperton is contractually barred from questioning the Deadlock and challenging the transfer, because, under Clause 8.4 of the SHAs, once Constellation's "*name shall have been entered into the Register of Shareholders of the Company in exercise of the aforesaid power, the validity of the transaction shall not be questioned by any person.*"[46]

158.   Second, Constellation emphasizes that a Deadlock unquestionably occurred on 7 August 2018.   That meeting was the first time that the Constellation Directors requested formal approval for the Disputed Cash Calls, and so they met the Fundamental Business Decision definition in Clause 4.9 of the SHAs.   Further, Clause 3.2 of the SHAs provides that shareholders are to meet all cash calls "*regardless of when such costs or payment obligations were incurred*", and there was an established practice of the Directors approving cash calls for past expenses.   As for the Respondents' other complaints about the Board Meeting and the Deadlock, they at best go to disputed facts – it is Constellation's position that the Alperton Directors did receive adequate notice of the vote because the meeting agenda referenced cash calls, and Constellation had provided extensive information in response to the Alperton Directors' requests.

159.   Third, even if no Deadlock had occurred, it is Constellation's case that Alperton would have lost its 45% equity interest in the Drillship Companies in any event.   As majority shareholder, Constellation could have: (*i*) caused the Drillship Companies to be in default on the project loans to third-party lenders, which would have permitted those lenders to foreclose on all shareholders; (*ii*) invoked a Deadlock vote over a disagreement concerning the restructuring, and transferred the Disputed Shares to itself for the (negative) Deadlock Sale Price; or (*iii*) seized the Disputed Shares on the Respondents' default on the Delba Carried Loans.   As to the third possibility, because Alperton failed to pay the Delba Carried Loans on their maturity dates in September and November 2018, Constellation had the right under Clause 9.3(a)(i) of the SHAs and Section 6.7 of the Delba Carried Loan Agreements to acquire Alperton's 45% shareholdings at the Deadlock Sale Price, subject to a 10% reduction.   Based on Constellation's preliminary appraisal in connection with the Deadlock, that Deadlock Sale Price is a negative number, even based on the Ratified Cash Calls alone.

160.   Constellation emphasized this third possibility in its Rejoinder.   Because the Share Charges that Alperton signed in favor of Constellation as security for the Delba Carried Loans allow Constellation to vote the Disputed Shares as a consequence of any default, Constellation could – without any notice or consultation – vote those Shares to approve a restructuring.[47]   Therefore, says Constellation:

>   *It is implausible that Constellation would orchestrate an elaborate scheme to fabricate a cash call deadlock when it could simply have exercised its undisputed contractual rights to acquire the [Disputed] Shares or vote them*

[46] Opposition, para 96.
[47] Rejoinder in Opposition to Application for Interim Measures ("**Rejoinder**"), para 40; C-24 and C-25, Share Charges § 8.1.

35

> *on Alperton's behalf, as a consequence of Respondents' undisputed payment default on the Delba Carried Loans.*[48]

161.    The Claimant further alleges that the RJ Proceedings themselves reflect that the Respondents are not likely to succeed on the merits.  The Claimant's Brazilian counsel disagree with Alperton's complaints about its limited ability to challenge the approval of the RJ Plan in Brazil, asserting that Alperton has had ample access but the courts "*have largely rejected those efforts.*"[49]

### 3)   Imminent and Irreparable or Substantial Harm

162.    The Claimant submits that, under New York Law, the Respondents must demonstrate clear and convincing evidence of irreparable injury absent the granting of the interim relief requested.  An irreparable injury, says the Claimant, is one that "*cannot be adequately compensated for in damages, or where there is no certain pecuniary standard for the measurement of damages.*"[50]

163.    Constellation contends, among other things, that the Respondents cannot show that they will suffer any injury – monetary or otherwise – from the proposed restructuring, which includes the restructuring of the substantial indebtedness of the Drillship Companies.  In fact, argues Constellation, the restructuring promises benefits to the Respondents.  This is because the Drillship Companies now owe approximately US$ 260 million in project loans, which they cannot repay.  In the RJ Plan, the project lenders to the Drillship Companies are willing to extend the debt until 2023, with the protection of cross-collateralization between the *Amaralina Star/Laguna Star* and the *Brava Star*, and there is a substantial risk that the lenders will foreclose without this cross-collateralization.  In response to the Respondents' argument that foreclosure would be economically irrational, Constellation's counsel submitted at the Hearing:

> *We submitted to you witness statements that tell you that if this restructuring is enjoined or delayed or meddled with, there is a substantial risk that the banks will foreclose upon their security interests, and that means seizure of the shares.*
>
> *Now, Alperton says there is no certainty the banks will do that and they say it is irrational for the banks to do that.  First, there is no need for certainty.  It is enough that there is a substantial risk of a liquidation associated with the relief requested.  And Alperton's opinion as to what the banks should do doesn't, respectfully, much matter.*[51]

164.    Further, Constellation alleges that the Respondents cannot show any irreparable injury from allowing the restructuring to proceed.  First, the loss of unique assets like the Drillships does not satisfy the standard of irreparable harm under New York law.[52]  Second, the SHAs require Alperton to transfer its shares to Constellation in a variety

---

[48] Rejoinder, para 41.
[49] Galdino & Coelho letter of 29 March 2019, at 4.
[50] Opposition, para 111, citing *JSG Trading Corp v Tray-Wrap, Inc*, 917 F.2d 75, 79 (2d Cir. 1990) (CLA-12).
[51] TR, at 90:21-25 and 91:2-14.
[52] Opposition, para 115, citing *Edge Group Waices LLC v Sapir Group LLC*, 705 F. Supp 2d 304, 313 (SDNY 2010) (CLA-52).

of circumstances, including not only Deadlocks but also defaults under the SHAs and failure to repay the Delba Carried Loans.  In other words, as Alperton has no absolute right to remain a shareholder, the transfer of the Disputed Shares "*is not a result that may properly be enjoined (or undone)*."[53]

165.    In any event, the Claimant submits that the Respondents themselves have admitted that an award of monetary damages will sufficiently protect them.  By letter of 29 March 2019, Constellation's Brazilian counsel challenge Alperton's asking the RJ Court to reserve US$ 381,339,450 as the value of its counterclaim in this arbitration, "*while at the same time asserting in this Arbitration, among other things, that its alleged damages are incalculable and money damages would be an insufficient remedy*."[54]

166.    The Claimant objects to the Respondents' contention that they will suffer irreparable harm because Constellation is insolvent.   New York law is to the contrary, says the Claimant, as New York state courts reject any "insolvency exception" to the principle that losses that may be quantified are not irreparable.[55]

167.    Finally, the Claimant objects to the Respondents' claim of imminent harm, due to their "*inexplicable delay*" in seeking interim relief.[56]  Constellation criticizes the Respondents for sitting on their rights long after 27 June 2018, when they acknowledge having learned about the restructuring discussions through Board meetings.[57]  Most significantly, Alperton did not pursue its application for emergency relief in the BVI court, even after learning in late 2018 that the Disputed Shares had been transferred and registered to Constellation, and cannot credibly claim to have been misled by Constellation's counsel in the course of settlement negotiations.  Nor did the Respondents seek relief promptly in this arbitration, waiting some two months after the Tribunal had been constituted to file its Application.

### 4)   Balance of Hardship Between the Parties

168.    For the last element of the test for interim measures, the Claimant again relies on New York law, which requires clear and convincing evidence that a balancing of the equities favors the position of the applicant for an injunction.  In weighing the balance of the equities, New York law principles oblige the Tribunal to consider the potential impact of interim measures not just on the Parties but also on third parties and the public interest.[58]

169.    The heart of Constellation's case on this element is that, despite the Respondents' disclaimers that they do not want to interfere with a legitimate restructuring of the Constellation Group, the interim measures they seek would do exactly that.

---

[53] Opposition, para 117.
[54] Galdino & Coelho letter of 29 March 2019, at 3-4.
[55] Opposition, para 119, citing *Crede CG III, Ltd v. Tanzanian Royalty Expl. Corp*, Index No. 651156/2018, 2018 NY Misc LEXIS 5452, at *15 (Sup Ct NY City, 21 Nov 2018) (CLA-74).
[56] Opposition, para 122.
[57] Answer and Counterclaims, para 137.
[58] Opposition, para 129, citing *Peterson v Corbin*, 275 A.D.2d 748, 750 (2d Dep't 2000) (CLA-29).

170. If the Tribunal enjoins the pledge, transfer or other encumbrance of the Disputed Shares, it would "*jeopardize the entire US$ 1.5 billion global restructuring of the Constellation Group, as confirmed by Constellation's investment bankers and restructuring advisors and the* [Drillship project] *Lenders themselves.*"[59] Constellation asserts that there is no practical alternative to the RJ Plan, which is the result of months of negotiations, and "*is supported by over 72% of the Company's secured and unsecured creditors, or creditors holding approximately US$ 1.1 billion of the Constellation Group's debt.*"[60] The Drillship Companies and their assets are critical to the RJ Plan. Cross-collateralization – the pledging of the *Amaralina Star* and *Laguna Star* as collateral for the loans of the *Brava Star* and the corresponding pledging of the *Brava Star* as collateral for the loans of the *Amaralina Star* and the *Laguna Star* – "*has been an unwavering requirement of the lenders.*"[61]

171. The Claimant predicts that failure of the RJ Proceedings, which could cause a "*freefall liquidation*", would inflict losses on the creditors and shareholders that "*could easily exceed US$ 700 million.*"[62] Even if liquidation could be avoided, the lost opportunity costs for the Constellation Group could reach some US$ 800 million over a 12 to 18 month delay in the restructuring.[63] Furthermore, failure or delay in the restructuring would also have a devastating effect on the creditors, on the 1,100 employees of the Constellation Group, and on the Group's suppliers and customers.

172. In comparison, says Constellation, the Respondents have not shown potential hardship – if they do not receive interim relief – even remotely matching that faced by the Constellation Group and others with interests in the restructuring. Indeed, in Constellation's view, the Respondents will benefit from the restructuring. As Constellation's counsel submitted at the Hearing:

> Given the substantial risk that a liquidation would ensue should this relief be granted, there is a fundamental contradiction in Alperton's position before you. Alperton says that it's essential that you preserve Alperton's supposed right to the Delba shares free of encumbrance. But the relief requested would create a substantial risk that Alperton would lose forever those shares. Given that contradiction, why is Alperton doing this? Parties generally don't do things against their own interest.

> It is not against their interest. Alperton hopes to get a ransom by holding this restructuring hostage. The ransom may be a quick payout, if you grant the relief, or it might be some form of relief from its obligations on the Delba carried loans.

> If we rephrase this in terms of the balance of equities, I think we can see that there is no real upside in the preliminary injunction to any legitimate interest held by Alperton. Their legitimate interest, they profess, is a right to the shares unencumbered, but that is jeopardized by the relief they seek.

---

[59] Opposition, para 131.
[60] Opposition, para 132.
[61] Opposition, para 133.
[62] Opposition, para 134.
[63] Opposition, para 135.

> *On the other hand, there is a staggering downside to Constellation and numerous stakeholders if this restructuring were meddled with.  And that underscores the need for a substantial bond.*

173.    Further, Constellation disagrees that the Respondents will lose any property rights in the Disputed Shares through the restructuring.  In support, Constellation has provided the Declaration of Justice Francisco Rezek, who, among other positions, served as a Justice of the Supreme Court of Brazil.  Justice Rezek, on instructions from Constellation's Brazilian counsel, addressed certain questions on Brazilian law raised by the Tribunal at the Hearing.  Justice Rezek considers that "*Alperton's right, if any, to demand a claim against Constellation will arise after the final Award of this Arbitral Tribunal.*"[64] Although such a creditor cannot make a submission in judicial recovery or bankruptcy procedure until the award is made and the total value of the claim is defined, the creditor may require a judge to reserve an estimated amount, as Alperton has done in the JR Proceeding.

174.    In the opinion of Justice Rezek, if the Tribunal ultimately rules that Alperton does have a property interest in the Disputed Shares, Alperton may take measures in court as a creditor of those Shares, but "*the manner of the enforcement and satisfaction of such a recognized right in the insolvency setting will be different from a normal setting, and will always be subject to consideration by the RJ Court in light of the adopted reorganization plan.*"[65]  Citing a Brazilian Superior Court of Justice decision, Justice Rezek adds that "*arbitration tribunals have jurisdiction to decide on the existence of claims and rights, but may not interfere with the distribution of the assets of a debtor that is undergoing an RJ proceeding.*"[66]

175.    Justice Rezek confirms that Alperton may claim a property interest in the Disputed Shares after the court ratifies the RJ Plan, but "*once again the manner in which such claim (if established) would be satisfied would have to be determined by the RJ Court in accordance with the provisions of the plan.*"[67]  Similarly, Justice Rezek confirms that Alperton's claim would not be extinguished if the Disputed Shares were pledged to creditors because "*the plan does not and cannot exclude rights,*" but "*the manner in which such a claim (if established) would be satisfied would have to be determined by the RJ Court in accordance with the provisions of the plan.*"[68]  Finally, asked about a possible re-transfer of the Disputed Shares, Justice Rezek states that the RJ Court could re-transfer the shares to Alperton, but "*will be required to take into account the plan, and whatever has already entered into force, to evaluate the possibility of retransferring the shares.  If not possible, Alperton will have a claim in damages.*"[69]

### 5)  Security for Costs and Damages

176.    Should the Tribunal not dismiss the Application for Interim Measures, the Claimant invokes Article 28.1 of the ICC Rules to request the Tribunal to order the Respondents to post substantial security to cover the losses faced by Constellation.

---

[64] Declaration of Justice Francisco Rezek of 29 March 2019 ("**Rezek Declaration**"), para 20.
[65] Rezek Declaration, para 32.
[66] Rezek Declaration, para 33.
[67] Rezek Declaration, para 34.
[68] Rezek Declaration, para 35.
[69] Rezek Declaration, para 36.

177.  In addition to a report of the UNCITRAL Working Group on Arbitration that it is the "*norm*" for tribunals to condition awards of provisional measures on the applicant posting security,[70] the Claimant relies on New York law, which it submits "*unambiguously requires a party seeking a preliminary injunction to post security sufficient to cover the losses that the other party may suffer*" (emphasis from the Claimant).[71]

178.  Noting the dramatic consequences that "*an improvident request to stay or delay a restructuring*" can have on the party seeking a restructuring, Constellation in its Opposition seeks security against the losses of at least US$ 700 million that the Constellation Group, its creditors and shareholders would suffer "*if it were forced into a free fall liquidation*."[72]   Even if a liquidation could be avoided, Constellation predicts that the incremental costs and lost opportunities associated with a 12-18 month delay in the restructuring could exceed US$ 800 million.

179.  In its Rejoinder, Constellation submits that, even if the Tribunal were to disregard the risk of liquidation, the Respondents should be required to post security for the additional incremental costs of US$ 33.4 million that the Constellation Group will incur as a result of further delay in the restructuring.   The total includes their own professional fees and the professional fees of the three largest creditor constituents, including attorneys' fees and fees for financial advisors, estimated by the Constellation Group's restructuring advisor to be approximately US$ 4.4 million per month, or US$ 26.4 million for six months.[73]   The total also includes a termination fee of US$ 7 million that can be triggered by creditors under the Amended PSA for the Constellation Group's failure to implement a plan including cross-collateralization.[74]

180.  In the Reply to Request for Reconsideration, the Claimant denies that there is any basis for the Tribunal to reconsider the US$ 33.4 million bond requirement in the Interim Order, on four grounds.

181.  First, the Claimant relies on international arbitration authorities, including those cited by the Respondents, to argue that tribunals do not exercise their authority to modify or suspend procedural orders absent new facts or changed circumstances.  The Claimant submits that the Respondents have presented no new facts or circumstances occurring since they made and lost their argument against a bond during the Hearing.[75]   Nor, says the Claimant, have the Respondents identified any arbitration award excusing a customary bond requirement on the ground of alleged poverty, and the circumstances in the New York authorities cited by the Respondent are distinguishable from "*high stakes corporate transactions, such as the* [Drill Ship Companies]*, involving sophisticated commercial parties*."[76]

---

[70] Report of the Working Group on Arbitration on the work of its sixty-sixth session (New York, 4-8 March 2002), UN Doc. A/CN.9/508 (2002) ¶ 60 (CLA-31).
[71] Opposition, para 141.
[72] Opposition, paras 143-144.
[73] Rejoinder, para 101; First Witness Statement of Gavin Kagan, para 21.
[74] Rejoinder, para 101; First Witness Statement of Gavin Kagan, para 20.
[75] Claimant's Reply to Request for Reconsideration ("**Reply to Request for Reconsideration**"), p 2.
[76] Reply to Request for Reconsideration, pp 3-4.

182.    Second, the Claimant argues that the Respondents have failed to address whether their beneficial owners or litigation funders have the means to post the US$ 33.4 million bond.  The New York courts, and at least one of the Respondents' own authorities, reflect that these are relevant considerations.[77]

183.    Third, the Respondents have not proposed any alternative means to the bond to protect Constellation and its stakeholders from the harm of an ultimately withdrawn injunctive order.  An unsecured undertaking is worthless if the Respondents in fact have no material liquid or illiquid assets.  A US$ 500,000 bond would be patently insufficient to compensate Constellation for the incremental professional fees associated with even a four-day delay of the restructuring, let alone the potentially significant delays associated with interfering with the complex RJ Plan.[78]

184.    In any event, even if the Respondents' description of their financial resources is credible, there cannot be any merit to their request that the Tribunal ultimately order the Claimant to return Alperton's shares.  Pursuant to the SHAs, the shareholders are to fund all costs not covered by the project loans and charter revenues through cash calls. The Respondents admittedly are incapable of complying with this obligation, much less paying back the Delba Carried Loans that are secured by executed promissory notes and share pledges.[79]

185.    Fourth, the Claimant submits that the Respondents have not shown that a US$ 33.4 million bond is demonstrably excessive.  Among other things, the Respondents misstate that a termination fee would not be payable following a Tribunal order, because the relevant provision of the Amended PSA applies only to any Final Order issued"[80]

## V.    ANALYSIS AND CONCLUSIONS OF THE TRIBUNAL

186.    The Tribunal opens its analysis by quoting the relevant rule for interim measures in the ICC Arbitration Rules.  Article 28(1) reads:

> *Unless the parties have otherwise agreed, as soon as the file has been transmitted to it, **the arbitral tribunal may**, at the request of a party, **order any interim or conservatory measure it deems appropriate**.  The arbitral tribunal may make the granting of any such measure subject to appropriate security being furnished by the requesting party.  Any such measure shall take the form of an order, giving reasons, or of an award, as the arbitral tribunal considers appropriate.*  (Emphasis added)

### A.    Applicable Standard for Interim Measures

187.    As an initial matter, with the Article 28(1) standard of "*appropriate*" interim relief in mind, the Tribunal appreciates the guidance found in both sides' positions on the

---

[77] Reply to Request for Reconsideration, p 4.
[78] Reply to Request for Reconsideration, p 4.
[79] Reply to Request for Reconsideration, p 4.
[80] Reply to Request for Reconsideration, p 5 footnote 18.

standard for granting interim measures.   The Tribunal notes in particular the Claimant's observation that "*even when invoking transnational standards, arbitral tribunals require a showing that is largely consistent with New York law.*"[81]

188.   While the Respondents' standard that the claim not be "*frivolous or vexatious*" appears to be too low, the Claimant's call for the New York law standard for equitable injunctive relief, as described, appears to require more than is appropriate for this ICC arbitration.   In specific, the Tribunal finds it sufficient for the Respondents, as applicants, to make out a *prima facie* claim and a *prima facie* case of reasonable probability of success on the merits, rather than prove a "*highly probable*" outcome by clear and convincing evidence based on undisputed facts.   It is to be expected that many facts, including critical facts, will be disputed at such an early stage of disputes as complex as those in this arbitration.   To require the Respondents to prove, on the preliminary factual and legal record, that they are likely to succeed on the merits would encroach on pre-judgment by the Tribunal, which must be avoided.   Further, the Tribunal considers that the potential adequacy of monetary damages is an important element, but not the sole standard, for measuring the likelihood of injury.

189.   Accordingly, the Tribunal will proceed to examine whether (*i*) the Respondents have made a *prima facie* claim and a *prima facie* case of a reasonable probability of success on the merits and (*ii*) the Respondents are likely to suffer irreparable or otherwise significant harm; and (*iii*) to balance the relative hardship between the Parties should the interim measures be granted.

190.   The Tribunal notes that the Parties have included substantial factual evidence and legal submissions in the record even at this early stage, only some of which is relevant and material to the instant Application.   To the extent such evidence and submissions are not addressed or referred to in this Interim Award, it is because the material goes to the ultimate merits of the disputes before the Tribunal.

### B.   *Prima Facie* Claim and Case on the Merits

191.   There is no dispute that the Tribunal has *prima facie* jurisdiction over this dispute. Constellation made affirmative claims in commencing this arbitration and the Respondents have filed counterclaims, all concerning the Deadlock and value of the Drillship Companies and the Delba Carried Loans.

192.   As for the merits, the Tribunal is satisfied that the Respondents have made out a *prima facie* case of a reasonable probability of success in proving ownership of the Disputed Shares.   The Tribunal finds that the Respondents have put forth a *prima facie* valid claim that the Deadlock arising from the 7 August 2018 Board of Directors meeting was not a valid Deadlock under Clause 8 of the SHAs, because Constellation's requesting retroactive approval of past expenditures was not "*requesting cash calls which are not provided for in the Budget,*" as necessary to meet the definition of a Fundamental Business Decision requiring unanimous consent of the Board in Clause 4.9 of the SHAs.   That there are, as Constellation points out, disputed facts about the scope of both the notice for the Board meeting and the information that was or was not provided to the Alperton Directors, does not, at this

---

early stage of the proceedings, undermine the Respondents' demonstration of a *prima facie* case.

193.    The Tribunal is not convinced by Constellation's argument that ownership of the Disputed Shares is established by its registration in the BVI Register of Members of the Drillship Companies, following the Deadlock Notice.  The BVI Companies Law, as cited by the Claimant, provides that such registration is only "*prima facie evidence that legal title in the share vests in that person*."

194.    Further, while Constellation is correct that Clause 8.4 of the SHAs provides that once a name has been entered into the Register of Shareholders of a Drillship Company "*the validity of the transaction shall not be questioned by any person*," the full text of Clause 8.4 reflects that the bar applies only when a shareholder has already become "*bound to transfer its Shares ... in accordance with any provision of this Agreement*" and the transfer is "*in exercise of the aforesaid power*."  The Tribunal accepts the submission of the Respondents that this would not be the case with the post-Deadlock share transfer if they prevail on their claim that the Constellation wrongfully engineered the Deadlock.[82]

195.    Overall, the Respondents' ownership claim appears *prima facie* to be supported by the virtually simultaneous Deadlock vote, Deadlock Notice and commencement of this arbitration.  The Tribunal cannot ignore the implications of the Claimant's action, on 7 August 2018 before commencement of the RJ Proceedings, to seek resolution of the ownership dispute through ICC arbitration.

196.    In sum, if the Respondents ultimately prove in this arbitration that Alperton remained the rightful owner of the Disputed Shares, those Shares were never rightfully part of Constellation's bankruptcy estate, and Alperton cannot be seen to be a creditor attempting to elevate its claims against other creditors.

197.    The Tribunal does not accept the submission of Constellation's Brazilian counsel that the Brazilian courts have "*largely rejected*" Alperton's claim to own the Disputed Shares.  The record reflects instead, as submitted by the Respondents' counsel, that Brazilian courts – no doubt for good reason, under local rules and practice – have ignored Alperton's claim to own the Disputed Shares, without addressing the merits of that claim directly or indirectly.

198.    Finally, the Tribunal is not swayed by the Claimant's argument that, even if there were no valid Deadlock leading to a valid transfer of the Disputed Shares, the Respondents would have lost their 45% equity interest in the Drillship Companies in any event.  This is speculation at this point.  The record reflects that:  (*i*) Constellation did not invoke a Deadlock over some disagreement concerning the restructuring, which it did not raise at the Board of Directors level for almost a year after negotiations started; (*ii*) Constellation did not cause the Drillship Companies to default on the project loans to third-party lenders and provoke foreclosure, which the Respondents submit would be financially unrealistic; and (*iii*) Constellation did not seize the Disputed Shares on the Respondents' default on the Delba Carried Loans, or

---

[82] Reply, para 26.

vote the Disputed Shares post-default to approve a restructuring, despite a default dating from September 2018.

199. What Constellation did do, as noted above, was to commence this arbitration on 7 August 2018 and mandate this Tribunal, in the course of resolving the dispute over ownership of the Disputed Shares, to determine the Deadlock Sale Price and the net outstanding amount owed for the Delba Carried Loans.  That Constellation could have pursued other avenues to deal with its alleged rights in relation to the Disputed Shares and Delba Carried Loans does not affect this Tribunal's responsibility to take this arbitration forward to an effective and enforceable final Award.

200. The Tribunal emphasizes that, in finding that the Claimant has made out a *prima facie* case on the merits, the Tribunal is not indicating any pre-judgment of the merits of the case.  There are complex claims and counterclaims to be resolved on the merits, if and when this arbitration proceeds.

### C.    Imminent and Irreparable or Substantial Harm

201. The Tribunal next finds that the Respondents have demonstrated that they will suffer irreparable or otherwise significant harm if the core interim measures are not ordered.

202. Based on the existing record, and in particular on the submissions made during and after the Hearing, this is not a difficult finding to make.  It is clear to the Tribunal that the RJ Plan, which substantively consolidates and cross-subsidizes insolvent Constellation Group assets with the Drillship Companies as solvent affiliates, poses a significant risk that the value of the Drillship Companies will be extracted for the benefit of other Constellation Group entities.

203. The urgency is clear.  The Creditors Meeting is now scheduled for 30 April 2019. The Parties agree that if the RJ Plan is approved at the Creditors' Meeting on 30 April (or shortly thereafter if postponed), RJ Court confirmation is likely to follow swiftly. These events would occur well before the Tribunal could issue a final Award to resolve, among other things, the ownership of the Disputed Shares.

204. It is also clear that these events would significantly and irreparably damage the Respondents, by making any final Award in Alperton's favor effectively unenforceable.  If the RJ Plan is approved by the creditors and confirmed by the RJ Court, the Disputed Shares will have been pledged, transferred or encumbered to the benefit of third parties, without any reasonable chance of being reclaimed, should the Tribunal issue a final Award in the Respondents' favor.

205. The Tribunal reads Justice Rezek's Declaration to confirm that, although Alperton technically might maintain the right to enforce a property interest in the Disputed Shares against the restructured Constellation holdings, once the Disputed Shares have been pledged, transferred or encumbered in a consolidated RJ Plan approved by the creditors and confirmed by the RJ Court, there is little if any practical value to that right.  We agree with the statement in the 31 March 2019 letter from Alperton's counsel that: "*although Justice Rezek explains that Brazilian law recognizes that 'arbitration  tribunals  have  jurisdiction  to  decide  on  the  existence  of  claims  and*

*rights' to property (para 33), the courts have offered no path for Alperton to preserve its claim to ownership pending this Tribunal's ruling on that claim.*"[83]

206.   The practical reality, in Justice Rezek's words, is that the RJ Court "*will be required to take into account the plan, and whatever has already entered into force.*"[84]   In the Tribunal's words, once the Disputed Shares have been pledged, transferred or otherwise encumbered, and the Drillship Companies and *Brava Star* company are cross-collateralized with the blessing of the creditors and the RJ Court, the likelihood of Alperton recovering either the Disputed Shares – with their valuable minority shareholder rights – is negligible.

207.   Nor, in the Tribunal's assessment, would there be a reasonable likelihood of the Respondents being able to recover reasonable monetary damages in a reasonable time for the loss of the Disputed Shares.   The record reflects that Constellation is in restructuring.   As submitted by the Respondents and indicated in Justice Rezek's Declaration, the best possible position for Alperton would be only an unsecured claim, with only a chance of a deeply discounted pro rata payment in 2050.

208.   The Tribunal does not agree with Constellation that Alperton's request to the RJ Court to reserve some US$ 381 million to protect its potential damages claim in this arbitration is inconsistent with the Respondents' allegation that they face significant and irreparable injury.[85]   Justice Rezek notes the availability of such a request for a reserved amount for an unperfected claim in Brazilian bankruptcy proceedings,[86] which appears to the Tribunal – as submitted by the Respondents – to be nothing more than an alternative contingent claim for protection should Alperton not prevail in the RJ Proceedings.

209.   In coming to these conclusions, the Tribunal has given serious consideration to Constellation's argument that the Respondents sat on their rights and so cannot be heard to complain about the imminence of the approval and confirmation of the RJ Plan.   The Tribunal is not able to give significant weight to this argument.   While the Respondents may not have pursued the BVI injunction proceedings diligently, the fact remains that they filed their Application for Interim Measures on the first business day after the US Bankruptcy Court lifted its stay.   Further, it was Constellation that chose not to inform Alperton of its restructuring plans until late June 2018, almost a year after the negotiations with creditors had started and only weeks before the purported Deadlock vote on 7 August 2018.[87]   If Constellation had been more transparent, the Respondents would have had significantly more time to preserve and protect their ownership of the Disputed Shares and, after the filing of the RJ Petition in December 2018, alert the Constellation Group creditors of their claims.

   D.   **Balance of Harm Between the Parties**

---

[83] Sullivan & Cromwell letter of 31 March 2018, at 3.
[84] Rezek Declaration, para 36.
[85] Galdino & Coelho letter of 29 March 2019, at 3.
[86] Rezek Declaration, para 22.
[87] Reply, para 44; R-12 and R-13, Draft 7 August 2018 Board Minutes, at ¶ 3.3.

210. To borrow the language of another ICC tribunal, it falls to this Tribunal to "*balance the relative harm to each party that may or may not flow from the granting or denial of the measures requested.*"[88]

211. In the Tribunal's assessment, granting the main interim measure requested – to order Constellation not to pledge, transfer or otherwise encumber the Disputed Shares pending a final Award – will allow Constellation to retain its 55% shareholdings and continue to have the majority vote and operational control necessary to continue the ongoing operations of the Drillship Companies, including in relation to the RJ Proceedings.  This interim measure will not return ownership of the Disputed Shares to Alperton, but will protect the Respondents' ability to prove entitlement to such shares in this arbitration with possible effect, by preventing the effectively irreversible loss of those Shares and underlying assets in the Drillship Companies.

212. In related vein, and considering that Constellation conducted restructuring negotiations without informing Alperton for almost one year, the Tribunal is satisfied that the Respondents are also entitled to interim relief directing Constellation to provide Alperton with adequate notice of any contemplated Fundamental Business Decision.  The same is not the case, at this time, for the Respondents' request that Constellation be enjoined on an interim basis from declaring or paying dividends, as such actions are not currently likely in view of Constellation's insolvency.

213. The Tribunal is not satisfied that granting these core interim measures will necessarily defeat or seriously delay the RJ Plan, and thereby cause disproportionate hardship to Constellation.  As reported by counsel, the Brazilian courts have recently ordered three entities of the Constellation Group to be carved out of the 18 entities in the consolidated proceedings, apparently without triggering the renegotiation that Constellation has predicted.  Similarly, if the Drillship Companies are carved out of the RJ Plan, at least temporarily, the creditors will have to price the risk that Constellation may – or may not – own the full 100% shareholdings in the Drillship Companies that Constellation desires to utilize and cross-collateralize in the RJ Plan.  The Tribunal is inclined to accept the prediction of the Respondents that:  "*If forced to respect Alperton's property rights, there is every reason to believe the various parties would come up with a solution rather than plunge the* [Constellation] *Group into a money-losing liquidation.*"[89]

214. In comparison, the risk that the Respondents would have to bear if the RJ Plan goes forward in the current consolidated form – without any effective avenue for unwinding a pledge, transfer or encumbrance of the Disputed Shares, as discussed above – is greater than that faced by Constellation with the interim measures in place.

215. In this connection, the Tribunal also notes that Constellation's own financial advisor, Houlihan Lokey, states that Constellation has cash to continue operations in the near future and the lenders have agreed to provide further funding for at least several more months,[90] and is not positive that creditors will withdraw their support.[91]   Further,

---

[88] ICC Case No. 12361 (Interim Award) at 62 (RLA-4).
[89] Reply, para 58.
[90] First Witness Statement of Gavin Kagan, paras 14-16.
[91] First Witness Statement of Gavin Kagan, paras 11-12.

Houlihan Lokey points out the market is rebounding and Constellation's assets are becoming more valuable.[92]

\*\*\*\*\*\*\*\*

216.   To conclude, as with its Interim Order of 8 April 2019, the Tribunal has decided to issue this Interim Award to preserve its ability to render an effective final Award on, among other claims and counterclaims, whether the Claimant or the Respondent Alperton owns the Disputed Shares.  Neither side would be able to prove its case and satisfy its requests for relief if the RJ Plan goes forward with the Disputed Shares consolidated with the other assets of Constellation and its affiliates.

### E.    Security for Costs and Damages

217.   Having decided to grant the Respondents' Application for Interim Measures in substantial part, the Tribunal reiterates and updates its decisions in the Interim Order concerning the Claimant's request that the Respondents be ordered to post security for both costs and damages, in the event the Claimant has been wrongfully restrained.

218.   In the Interim Order (quoted in full above at paragraph 106), given the imminence of the Creditors Meeting then scheduled for 10 April 2019, the Tribunal ordered that the interim measures ordered in the Respondents' favor in the Interim Order were to be immediately effective, subject to dissolution in 10 days unless the Tribunal were to be satisfied that the Respondents had posted a proper bond and provided a proper written unsecured undertaking in favor of the Claimant, as ordered.

219.   As noted above, in order to be able to consider fully the Parties' positions in the Request for Reconsideration and related Reply before the Creditors Meeting rescheduled for 30 April 2019, the Tribunal on 18 April 2019 amended the Interim Order to extend the deadline for dissolution of the interim measures ordered from 18 April to 28 April 2019.

220.   In exercising its discretion in relation to ordering security,[93] the Tribunal has determined not to order security for costs of this arbitration.  The Tribunal reserves all issues related to such costs for further proceedings and the final Award.

221.   The Tribunal further has determined not to order the full security for damages requested by the Claimant for potentially foregone business opportunities following possible liquidation, valued at up to US$ 700 to 800 million.  The Tribunal considers such damages to be unduly speculative.

222.   Turning to the issue of the security bond and the Respondents' Request for Reconsideration, the Tribunal has determined not to vacate the Interim Order requirement for a US$ 33.4 million bond but to lower the bond amount to US$ 10 million.

---

[92] R-43, Houlihan Lokey Feasibility Report, paras 17-23.
[93] ICC Case No. 12196, Interim Award, at 59 (RLA-74).

223.   The Tribunal continues to recognize the serious import of the Interim Order and this Interim Award on the RJ Proceedings, with the potential impact increasing with any resulting delay in the restructuring.   However, the Tribunal finds merit in the Respondents' arguments, first, that the Constellation Group and its lenders have incentives to expedite renegotiation of the RJ Plan and, second, that the Claimant has some control over the amount of incremental costs incurred over any delay period. Under the circumstances, and with the invitation to the Parties to pursue expedited arbitration proceedings to reach a final Award as soon as possible, the Tribunal considers it reasonable to provide bond security in the amount of US$ 7 million for approximately two months rather than six months of potential delay.   As for the potential termination fee, the Tribunal finds merit in the Claimant's argument that neither this Interim Award nor a final ICC Award is the type of Final Order issued "*by any governmental authority, any regulatory authority, or any other court of competent jurisdiction*" necessary to avoid a termination fee under the Amended PSA. Noting the Respondents' calculation of a current US$ 2.9 million termination fee, and the formula in the Amended PSA for the increase in the fee,[94] the Tribunal has determined to use the amount of US$ 3 million as a proxy for a termination fee chargeable within the next two months.

224.   In assessing the Respondents' Request for Reconsideration and deciding to continue a lower bond requirement, the Tribunal has not given weight to the Parties' respective predictions of their likely success on the merits.   The Tribunal has given careful consideration to the access to justice concerns raised by the Respondents in connection with the imposition of any substantial bond obligation.   On balance, however, particularly without any proffer as to the financial situation of the Respondents' ultimate shareholders, the Tribunal cannot conclude that such access to justice concerns justify putting all financial risk on the Claimant.

225.   In sum, the Tribunal determines to grant the Claimant's request for security for damages in the amount of US$ 10 million for the additional and incremental costs that the Constellation Group is likely to incur over the next two months, pending an expedited final Award in this arbitration, as a result of the predicted further delay in the restructuring.   In specific, the total covers costs for:   (*i*) professional fees, estimated at US$ 7 million; and (*ii*) an estimated termination fee of US$ 3 million to which the Constellation Group is subject under the Amended PSA for failure to implement the cross-collateralized restructuring.   The security awarded is to be established in the form of a bond to be issued by an independent financial institution in New York City having at least an investment grade rating or equivalent, the detailed terms of which are to be agreed by the Parties, subject to approval by the Tribunal.

226.   As a precaution, the Tribunal further determines that, if the arbitration proceedings extend beyond an initial expedited two-month period, the Claimant may apply to the Tribunal to continue and increase the bond by similar amounts for additional periods.

---

[94] Request for Reconsideration, at p 6 footnote 6.

227. The Tribunal also determines to require the Respondents to provide to the Claimant a written unsecured undertaking to be responsible for the costs and damages in excess of the ordered bond, to the extent and in the amounts proven to the Tribunal.

228. Finally, the Tribunal has determined not to grant additional security, at this time, for the interest reportedly accruing on the consolidated debtors' outstanding financial indebtedness following the filing of the RJ Petition.

## VI. DISPOSITION

For the reasons set forth above, the Tribunal **ORDERS** as follows:

1. The Respondents' Application for Interim Measures is granted in part, as follows:

   a. The Claimant shall refrain from pledging, transferring or otherwise encumbering the Disputed Shares in the Drillship Companies, pending a final Award;

   b. The Claimant shall refrain from pledging, transferring or otherwise encumbering the underlying assets of the Drillship Companies other than in the ordinary course of their business, pending a final Award;

   c. The Claimant shall give Alperton adequate notice, in all cases no less than 30 days' notice, of any contemplated Fundamental Business Decisions, as defined in Clause 4.9 of the Shareholders' Agreements (or any other decision requiring unanimous Shareholder or Board approval under the Shareholders' Agreements), pending a final Award.

2. The Respondents' Application for Interim Measures is denied insofar as the Respondents seek an order that the Claimant refrain from declaring and paying dividends or capital distributions.

3. The Tribunal grants the Claimant's request for security for damages in the amount of US$ 10 million for the additional and incremental costs that the Constellation Group is likely to incur over the next two months, pending an expedited final Award, as a result of the predicted further delay in the restructuring, in specific, costs for: (*i*) professional fees, estimated at US$ 7 million; and (*ii*) a termination fee of US$ 3 million to which the Constellation Group may be subject under the Amended PSA for failure to implement the cross-collateralized restructuring. The Respondents are ordered to provide this security in the form of a bond to be issued by an independent financial institution in New York City having at least an investment grade rating or equivalent, the detailed terms of which are to be agreed by the Parties, subject to approval by the Tribunal. If the arbitration proceedings extend beyond an initial expedited two-month period, the Claimant has leave to apply to the Tribunal to continue and increase the bond by similar amounts for additional periods.

4. The Respondents are further ordered to provide to the Claimant a written unsecured undertaking to be responsible for any costs and damages in excess of

the bond ordered in paragraph 3 of this Disposition, to the extent and in the amounts proven to the Tribunal.

5. The interim measures ordered in the Respondents' favor are **immediately effective**, subject to dissolution in **30 days** unless the Tribunal is satisfied that the Respondents have posted a proper bond and provided a proper written unsecured undertaking in favor of the Claimant, as ordered in paragraphs 3 and 4 of this Disposition.

6. The issue of assessment of costs for the Application for Interim Measures is reserved for the final Award.

7. All other claims are reserved for one or more future awards.

**Place of Arbitration**: New York, New York, United States

**Dated**:  26 April 2019

…………………………                    ……………………………
Mark Kantor                                      Daniel Jackson

……………………………
Professor Lucy Reed
President

50